**COAST VILLAGE, INC.,**
**et al., Plaintiffs,**

v.

**EQUILON ENTERPRISES,**
**LLC, Defendant.**

**No. CV00–05498ABC(JWJX).**

United States District Court,
C.D. California.

Aug. 17, 2001.

Thomas Bleau, Esq., Martin Fox, Esq., Bleau, Fox & Associates, Los Angeles, CA, for Plaintiffs.

David Destino, Esq., Peter James, Esq., Nigel Jacques, Esq., Baker & Hostetler, Los Angeles, CA, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: PHASE ONE OF TRIAL; PETROLEUM MARKETING PRACTICES ACT, 15 U.S.C. § 2801 *et seq.*

COLLINS, District Judge.

This case involves Plaintiffs' claims pursuant to the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.* ("contract claims"), as well as their claims under California pricing and unfair competition statutes ("pricing claims"). On April 23, 2001, as agreed to by the parties, trial of these two types of claims was bifurcated: a Phase One trial of the PMPA contract claims; and a Phase Two trial of the state pricing claims. On May 7, 2001, this Court determined that Phase One did not require a jury. Accordingly, a non-jury trial (Phase One) was held before the Honorable Audrey B. Collins, District Judge presiding, from July 3, 2001 to July 18, 2001, on Plaintiffs' PMPA claim(s). Having considered all the evidence presented at trial, and the arguments of counsel, the Court ENTERS the following Findings of Fact and Conclusions of Law, pursuant to Fed. R. Civ. Pro. 52(a):

## I. FINDINGS OF FACT

**Trial Presentation and Glossary of Basic Terms**

1. Plaintiffs called a total of thirty-one witnesses during the nine-day court trial. Defendant (also hereinafter called "Equilon") called a total of six witnesses of its own. The parties were each allotted a total of twenty-five (25) hours to be divided at their discretion between direct and cross-examination, and opening statements. An additional two (2) hours was allotted for closing arguments, such that each side was afforded a total time of twenty-seven (27) hours.

2. Nine of Plaintiffs' witnesses are/ were employees of Equilon or its affiliates: EUGENE GOLL ("Goll"), Business Operations Manager in Sales and Marketing for Equilon since its 1998 formation/creation; MICHAEL HANLEY ("Hanley"), Manager of Asset Management for Equiva Services until September, 2000; LARRY TURNER ("Turner"), Area Real Estate Manager for Equiva Services in the Pacific South Region ("PSR") of Equilon's network; DOUG ELSTON ("Elston"), Project Manager for Equilon since August, 1999, and previous Real Estate Manager for Equiva Services; DAN LITTLE ("Little"), General Manager of Merchandising for Equiva Services, and General Manager of Sales for Equilon in the PSR from April, 1998 to May, 2000; PETER HALLBERG ("Hallberg"), Planning Manager for the PSR; DAVID BURROW ("Burrow"), General Manager of the PSR since June, 2000; ROBERT MUSTAIN ("Mustain"), Contract Operator Retail Outlet Sales Manager for the PSR; and JOHN LUCIANI ("Luciani"), Pricing Manager for the PSR since May, 1998. These titles are based on the witnesses' own testimony.

3. Plaintiffs also called seventeen Equilon lessee dealers, all of whom are named Plaintiffs: HANI MAKSIMOUS ("Maksimous"), a Shell Oil Company-branded lessee dealer ("Shell dealer") for (approximately) 16 years as of trial; KEVORK

SISLIAN ("Sislian"), Shell dealer for 9 years; RON ABEL ("Abel"), Shell dealer for 37 years; ALFRED BUCZKOWSKI ("Buczkowski"), Shell dealer for 31 years; SAMI MERHI ("Merhi"), Shell dealer for 30 years; FOUAD DAGHER ("Dagher"), Shell dealer for 18 years; EDGARDO PARUNGAO ("Parungao"), Shell dealer for 10 years; ZULEIKA KAPLAN ("Kaplan"), Shell dealer for 12 years; SHAROKH KASHANIROTH ("Kashaniroth"), Texaco dealer for 14 years; LINDA UELLNER ("Uellner"), Shell dealer for 30 years; SHAILA MANTRI ("Mantri"), Shell dealer for 6 years; JOHN RABADI ("Rabadi"), (former) Shell dealer for 17 years; KADJIC TERLSIAN ("Terlsian"), Shell dealer for 28 years; PAUL WILSON ("Wilson"), Shell dealer for 5 years; WALID NOUR AYOUB ("Ayoub"), Shell dealer for 4 years; CARLOS MARQUEZ ("Marquez"), Shell dealer for 22 years; and ESEQUIEL DELGADO ("Delgado"), Shell dealer for 38 years (Estimated tenures).

4. The five remaining witnesses called by Plaintiffs were: EVE WILLIAMS ("Williams"), an M.A.I.-certified commercial real estate appraiser; RON RAVILLE ("Raville"), a commercial real estate broker specializing in sales of gasoline stations; KEITH FULLINGTON ("Fullington"), a former Shell dealer (for 13 years) who is not a Plaintiff in this case; DR. RICHARD HANSON ("Hanson"), a forensic economist called as an expert to establish Equilon's book value for exemplary damages; and STEPHEN SHELTON ("Shelton"), a petroleum marketing expert.

5. Plaintiffs also read portions of deposition testimony from two additional witnesses into the trial record: CHRISTOPHER MURDOCK ("Murdock"), General Manager of Company Operations for Equilon; and JOHN DARNLEY ("Darnley"), Vice President of Sales and Marketing for Equilon since its formation.

6. Defendant called six witnesses—four employees of Equilon or its affiliates, and two non-employees: LAURA STYSLINGER ("Styslinger"), Manager of Rent Programs for Equiva Services since April, 2000, before that part of the legal departments at Shell Oil Company (10 years) and Equilon; JEFFREY ROUSE ("Rouse"), commercial real estate appraiser specializing in gasoline stations, employee of Hopkins Appraisal Services, Inc.; TERRY RUNNELS ("Runnels"), a Sales Manager in the PSR overseeing some of the Plaintiffs' stations; GEORGE RADICI ("Radici"), a Sales Manager in the PSR; DR. JOHN UMBECK ("Umbeck"), an economist focusing on the petroleum marketing industry; and ROBERT MORRIS ("Morris"), General Manager of Equilon's Southwest Region since June, 2000, prior General Manager of Marketing Development & Network Development for Equilon. Descriptions are based on witnesses' testimony.

7. Given the large number of acronyms and abbreviations which appeared in trial evidence and testimony, the Court had the parties jointly prepare a glossary of terms. Among the more important terms to which the parties have stipulated are the various "classes of trade" into which Equilon's (and before that Shell's and Texaco's) dealer network is divided. There are essentially four different avenues through which Equilon delivers petroleum products to the purchasing public:

(a) Retailer Operated Retail Outlets ("ROROs"): These are stations where Equilon (or an alliance company)[1] either owns the premises, or

---

1. The "alliance companies" are those entities which were joined in 1998 to form either/both Equilon and Motiva. *See infra* ¶ 9(m).

retains the master lease, and leases it to a lessee-dealer. All Plaintiffs fit this class of trade, and may hereinafter be called ROROs.

(b) Contractor Operated Retail Outlets ("COROs"): These are stations owned by Equilon or an alliance company which are operated by a contractor with/through Equilon.

(c) Salary Operated Retail Outlets ("SOROs"): These are also stations owned by Equilon or an alliance company, which are operated by Equilon/alliance employees.

(d) Open Retail Outlets ("OROs"): These are stations where the retailer owns the property him or herself and has a supply agreement with Equilon or an alliance company.[2]

8. A fifth "class of trade" is less focused on retail sales, though apparently this is also a possibility. This is the class of trade known interchangeably as both "Jobbers" and "WOROs" (standing for Wholesaler Operated Retail Outlets). These intermediary wholesalers purchase petroleum products from Equilon or alliance companies and resell to retailers. *See, e.g.,* Goll testimony; *see also* Little testimony.

9. Other terms discussed in varying detail throughout the trial testimony and exhibits, which it may be helpful to define in one location, include the following acronyms/abbreviations:

(a) APC-an Ancillary (or Alternative) Profit Center, which is a non-gasoline source of revenue, such as a car wash or convenience store, or a fast food restaurant (QSR).

(b) QSR-a Quick Service Restaurant, which is a fast food restaurant located on or near a retail station (e.g., McDonald's, Taco Bell, Subway, or other brands).

(c) C–Store–abbreviation for a station convenience store.

(d) PSR–Pacific South Region, which is the regional market within the Equilon network surrounding Los Angeles and adjoining cities (from Fresno down to Orange County).

(e) NTI–New to Industry, which is a terminology adopted to described a wholly new station to be opened under an Equilon (or alliance company) brand name.

(f) NTA–New to Alliance, a terminology adopted to describe an existing retail station formerly operating under a non-Equilon (or alliance company) brand name.

(g) SMI-the Strategic Marketing Initiative, a marketing strategy study and planning process begun by Equilon soon after the consolidation of the alliance companies.

(h) RPS-the Regional Planning System, an extension of SMI to study and plan marketing in individual geographic regions within the dealer networks (e.g., the PSR).

(i) SMERF–Star Model for Evaluation of Retail Facilities, a spreadsheet model used to predict return on investment and/or net present value of retail stations.

(j) Starfire Report-financial analysis of site potential.

(k) TSF–Total Site Franchise, which is a term attached to a new channel of trade proposed/identified by SMI under which an alliance company and a retail dealer would share in

---

**2.** These terms are ubiquitous throughout trial testimony. They are most usefully defined and/or described in the *Goll* testimony.

some or all revenue streams. Also called a Virtual Site Franchise ("VSF") or a "CORO II."

(*l*) TDA–Territory Developer Alliance (or Agreement), which is another term apparently developed during SMI for an extension of the WORO or Jobber concept where alliance companies would enter into a joint venture with WOROs or Jobbers and share in revenue streams from APCs.[3]

(m) Equilon was formed in 1998 by Texaco Inc. ("Texaco") and Shell Oil Company ("Shell") affiliated companies; Texaco and Shell transferred their U.S. marketing and refining assets west of the Appalachians to Equilon. Motiva Enterprises LLC ("Motiva") was formed in 1998 by Texaco and Shell, and also by Star Enterprises ("Star") and Saudi Refining, Inc. ("SRI"); these four companies transferred their U.S. marketing and refining assets east of the Appalachians to Motiva. Equilon and Motiva (and/or their predecessor companies) are called the "alliance companies." *See, e.g.,* Goll testimony.

## Plaintiffs' Challenge to the New Agreements under the PMPA

10. Though a great deal of Plaintiffs' evidence at trial also focused on issues separate and apart from the development and promulgation of the new lessee-dealer agreements which are the subject of Plaintiffs' claims under the PMPA, at heart Plaintiffs' PMPA claims must focus on the agreements themselves, and on the development of the terms therein. These new franchise agreements were first distributed to Plaintiffs and other lessee-dealers in the PSR in March of 2000. Plaintiffs instituted this civil action soon after.

11. The "new paper" which was rolled out to the Plaintiffs in or around March of 2000 consists primarily of two agreements: (1) a Retail Facility Lease ("RFL") which governs terms and conditions for occupation of the leased premises; and (2) a Retail Sales Agreement ("RSA") which lays out the terms and conditions for the sale/re-sale of petroleum and products.[4] Collectively, the two contracts will hereinafter be called the "new agreement(s)." A sample RFL and a sample RSA were submitted as Exhibits 129 and 130, respectively.[5] The Court will refer to these two Exhibits in describing their terms.

## Contract Provisions at Issue in Plaintiffs' PMPA Claim(s)

12. The provisions of the new agreements upon which Plaintiffs have focused in articulating their PMPA claim(s) include:

(a) The provision(s) in the RFL which supply the monthly "base rent" charged to lessee-dealers for their use of a leased station premises (the "Rent" provisions). The amount

---

**3.** Again, in addition to appearing in the glossary of terms agreed to by the parties, these terms and abbreviations appear throughout the evidence and testimony. *See, e.g.,* Goll testimony; Hanley testimony.

**4.** Other documents and disclosures were also apparently included in the packets which were distributed to lessee-dealers in the Pacific South Region in or around March, 2000 (e.g., a Franchise Disclosure Statement, a Guaranty for corporate or limited liability franchisees, a Monitoring of Underground Storage Tanks Letter Agreement, and a Re-Appraisal Request Notice Form). *See* Exhibit 1143. However, for the purposes of this trial, only the RFL and the RSA were put at issue.

**5.** Samples of these new agreements are also reproduced in several other exhibits, most notably in Exhibit 1143, which is a sample of the complete packet distributed to Plaintiffs and other lessee-dealers in the Pacific South Region in or around March, 2000. *See* Exhibit 1143.

charged for "base rent" varies in each contract, and is a result of an underlying formula applied to the appraised value of the land, the improvements, and the equipment comprising each leasehold. The formula which supplies this "base rent" based on the appraised values is not specified in the agreements. Testimony at trial established that "base rent" is determined by summing ten percent (10%) of the land value and twelve percent (12%) of the improvement/equipment value, and dividing that total by twelve (12) to arrive at a monthly "base rent." *See* RFL Part I, Art. 4; RFL Part II, Art. 4(a) (Exhibit 129); Styslinger testimony; Hanley testimony. In addition to "base rent," under the new agreements lessee-dealers are charged "double net" expenses.[6]

(b) The provision(s) in the RFL which pass through to the lessee-dealers the costs of station maintenance (the "Maintenance" provisions). Again, the amounts charged for Maintenance are based on an algorithm which is not articulated in the agreements; testimony given at trial indicated that it is based on a historical average of maintenance costs on the stations within a given region (e.g., Pacific South Region). In other words, each of the stations in a region pays this same amount, rather than covering actual costs of maintenance at his or her own station. In the new agreements rolled out to the lessee-dealers in the Pacific South Region in 2000, the Maintenance fees are $1,488.00/month for the first year of the agreements, $1,533.00/month for the second year, and $1,579.00/month for the third year. *See* RFL Part II, Art. 8 (Exhibit 129); Exhibit A to RFL; Styslinger testimony; Hallberg testimony; Goll testimony.

(c) The provision(s) in the RFL which pass through to the lessee-dealers the costs of federal, state, and local taxes, excises, duties, and other assessments/charges, fees or business charges (the "Tax" provisions). The amount would vary from station to station, and though the basis for its calculation is not specified in the agreements and was not articulated at trial, based on comparison figures which were supplied to the Court in a Stipulation between the parties, it appears that the intent is to charge lessee-dealers the actual cost(s) of taxes and other charges levied on the property. *See* RFL Part II, Art. 7(a) (Exhibit 129); Exhibit A to RFL; Joint Stipulation and Order Re: Plaintiffs' Old Rents, New Rents, Appraisals and Property Taxes (the "Rents and Appraisals Stipulation") filed July 17, 2001.

(d) Mutual release provisions in both the RFL and the RSA by which the signatories (the lessee and Equilon) agree to release one another from all claims which each may have against the other (known or unknown) aris-

---

**6.** The combination of the Taxes (plus other fees and assessments) and the Maintenance Fee charged in the RFL are referred to therein as the "Double Net Monthly Rental Expenses." *See* RFL Part II, Art. 4(a) (Exhibit 129); Exhibit A to RFL. The total monthly payments due under the new RFL proffered in early 2000, therefore, would be a combination of "base rent" (the amount supplied for the actual Rent provision) and "double net" expenses. This combination will hereinafter be referred to as the "Monthly Lease Payments" due under the new agreements. This figure does not include any amount due for petroleum or products under the RSA (*see* RSA Part I, Art. 2; RSA Part II, Art. 2–3 (Exhibit 130)).

ing from any prior lease, except claims by the lessor (Equilon) against the lessee for indebtedness, reimbursement, or indemnification (the "Release" provisions). *See* RFL Part II, Art. 28 (Exhibit 129); RSA Part II, Art. 31 (Exhibit 130). These Release provisions also include language stating that they each function as a general release of all claims which either exist or may later be discovered by a lessee. They are also supplemented (presumably only for lessee-dealers in California) by a "California Rider" which accompanies the RFL, which is a "General Release" provision explicitly acknowledging California Civil Code Section 1542. *See* Exhibit 129.

(e) Provisions in both the RFL and the RSA setting forth a one-year limit (measured from the date of the incident giving rise to the claim) on institution of any "court proceedings" (except for an action brought by Equilon to collect indebtedness) by either party against the other (the "Statute of Limitations" provisions). *See* RFL Part II, Art. 27 (Exhibit 129); RSA Part II, Art. 30 (Exhibit 130). These provisions also require that the parties first seek to resolve any disputes through alternative dispute resolution ("ADR") proceedings, and that they wait sixty (60) days to institute any suit.[7]

(f) Provisions in both the RFL and the RSA allowing Equilon (but not the lessee) to recover reasonable attorneys' fees and other legal costs in-

curred as a result of any action taken to secure, protect or enforce its rights under the agreements (the "Attorneys' Fees" provision). *See* RFL Part II, Art. 29 (Exhibit 129); RSA Part II, Art. 32 (Exhibit 130); Summary Judgment Order at 23.

(g) Provisions in both the RFL and the RSA purporting to limit the type(s) of damages available to either party in any action arising under the new agreements (e.g., no indirect, special, incidental, consequential, or punitive damages) on any legal theory (the "Limitation of Liability" provision). *See* RFL Part II, Art. 17 (Exhibit 129); RSA Part II, Art. 17 (Exhibit 130).

(h) Provisions in both the RFL and the RSA purporting to limit the ability of lessee-dealers to sell, transfer, or assign their rights under the agreements to a third party where that third party has not previously been an Equilon franchisee (the "Trial Franchise" clause). The language of the Trial Franchise clause is as follows:

Except to the extent limited by applicable Law, if [the lessee] desires to Transfer its interest in this Agreement to an individual or Business Entity that has not previously operated as [a retailer for Equilon or for one of its affiliates], then [the lessee] may be required to execute a mutual termination of this Agreement and the proposed transferee may be required to execute a trial franchise agreement as a condition to [Equilon] granting its consent to the Transfer.

---

7. Though the ADR requirement was at one time another provision to which Plaintiffs pointed as allegedly violative of the PMPA, this was not an issue which was raised during the course of this trial. As is discussed below, in its prior Summary Judgment Order, the Court found that inclusion of this ADR provision in new agreement(s) presented to Plaintiffs on a "take it or leave it" basis did not violate Section 2805(f) of the PMPA (15 U.S.C. § 2805(f)). *See infra* ¶¶ 32–33.

*See* RFL Part II, Art. 18(b) (Exhibit 129); RSA Part II, Art. 22(b) (Exhibit 130). "Trial franchise" is a term of art under the PMPA describing a petroleum franchise wherein the franchisee has not previously been a party to a franchise with the franchisor, the initial term is less than one year, and the franchise agreement states it is a "trial franchise." A trial franchise may be terminated without cause. *See* 15 U.S.C. § 2803(b)(1).

(i) Provisions in both the RFL and the RSA requiring that lessees, in the event that they do sell, transfer, or otherwise assign their rights under the agreement(s), pay Equilon a transfer fee prior to or at the closing of the transfer (the "Transfer Fee" provision). The amount of the transfer fee is the greater of $6,500.00 or a percentage of the "gross sales price" (determined by appraisal), a percentage which declines based on the number of years the franchisee has had a franchise with Equilon (35% down to 0%). *See* RFL Part II, Art. 18(e) (Exhibit 129); RSA Part II, Art. 22(e) (Exhibit 130).

(j) A provision in the RFL reserving to Equilon the right to make use of the leased premises "so long as any such use does not materially interfere with the authorized use of the Premises then being made by Lessee," up to and including "erection of additional buildings" and other alterations of the premises such as adding a car wash, convenience store, fast food facility, laundry, or other business, or installing pay telephones, video display terminals, computers, vending machines, and so forth (the "Use and Investment" provision). Equilon also reserves to itself the right to any fees, income, rentals or other revenue generated by such uses and facilities. *See* RFL Part II, Art. 2(b) (Exhibit 129).

(k) A sub-section of the Rent provision in the RFL which allows that if Equilon makes an "Alteration" to the leased premises of $100,000.00 or more (or some other amount if Equilon provides written notice of a change in the threshold investment amount), "upon completion of the Alteration and notification to Lessee, Lessee's rent will be adjusted· by [Equilon] ... to reflect [Equilon's] additional investment in the premises as reasonably determined by [Equilon]." The methodology to be utilized in this re-calculation of the rent is not spelled out in this provision (the "Re–Appraisal" provision), nor is whether a lessee has any avenue for challenge. *See* RFL Part II, Art. 4(a) (Exhibit 129).

(*l*) Finally, provisions in the RFL and the RSA stating that these agreements are personal to the lessee-dealer, and that the lessee may only transfer its interest therein as it pertains to operation of a "motor fuel dispensing station or automobile service station, as the case may be, and any facilities for uses otherwise authorized under [the RSA] revert back to [Equilon] at [Equilon's] sole discretion." RFL Part II, Art. 18(a); RSA Part II, Art. 22(a). Testimony at trial clarified that this provision (the "Ancillary Use" provision) was designed to "grandfather" in "non-standard" uses of the premises but to prevent those uses (e.g., U–Haul centers) from being transferred to subsequent assignees. *See, e.g.,* Styslinger testimony; Hanley testimony.[8]

---

8. Of these allegedly offending provisions, only the Release and General Release provisions,

13. Each of the new agreement(s) also contains a "Severability" provision allowing for invalid or unenforceable provisions thereof to be severed from the rest of the agreement(s), so as to preserve enforcement of the rest of the agreement(s):

> The provisions of this [Agreement] are severable. If any provision of this [Agreement] is, for any reason, invalid or unenforceable, the remaining provisions of this [Agreement] are valid and enforceable *if the basic intent of the parties is still capable of being achieved.* RFL Part II, Art. 30(d) (Exhibit 129); RSA Part II, Art. 33(d) (Exhibit 130) (emphasis added).

14. During trial, witnesses who are/were employees of Equilon or its affiliates (this category of witnesses will hereinafter be called "Equilon employee-witnesses," or simply "employee witnesses")[9] established that the "basic intent" of these agreement(s) was to set forth the terms and conditions under which the franchisor agreed to lease station premises to a franchisee, and under which the franchisee agreed to sell petroleum/products made available by the franchisor. These witnesses testified that this "basic intent" would survive the severance of all or most of the contested provisions, including the Release, Statute of Limitations, Limitation of Liability, and Trial Franchise provisions. *See, e.g.,* Goll testimony; Styslinger testimony; Morris testimony.

**Basic Timeline of Major Events Pertinent to the Case**

15. Prior to 1998, Plaintiffs and other lessee dealers in the respective Shell and Texaco dealer networks had individual (1) lease and (2) retail sales agreements with either Shell or Texaco. The agreements were for differing terms, had varying effective and renewal dates, and may have contained varying provisions (especially those held by Shell dealers versus those held by Texaco dealers), but presumably they were effective through and beyond July, 1998. *See, e.g.,* Exhibit 1141 (Motor Fuel Station Lease between Shell and Plaintiff Sislian, effective April 1, 1995–March 31, 2000); Exhibit 1142 (Dealer Agreement between Shell and Plaintiff Sislian, also effective April 1, 1995–March 31, 2000).

16. Equilon (the combination of Shell and Texaco marketing and refining assets west of the Appalachians) and Motiva (the combination of Shell, Texaco, Star, and SRI marketing and refining assets east of the Appalachians) were formed as of an effective date of January 1, 1998. *See* Goll testimony.[10]

---

Limitation of Liability provision, Trial Franchise clause, Transfer Fee provisions, Attorneys' Fees provision, and Rent, Tax, and Maintenance Fee provisions were listed in the FAC as being allegedly violative of the PMPA. The remaining provisions identified herein (the Use and Investment provision, the Re-Appraisal provision, and the Ancillary Use provision) were not contested in the FAC, and were raised by Plaintiffs only at trial. Other provisions in the new agreements identified in the FAC as violating the PMPA, but on which little or no testimony or evidence was offered at trial, are a Minimum Gallonage clause (*see* RSA Part I, Art. 2 (Exhibit 130)), and an Inspection and Audit provision (*see* RSA Part II, Art. 13 (Exhibit 130)). These two provisions are therefore not part of this Court's decision-making on Plaintiffs' First Claim for Relief under the PMPA.

**9.** This appellation is used without regard to which side actually *called* a particular witness who is/was an Equilon/alliance employee.

**10.** It appears that the actual merger which formed Equilon, Motiva and their affiliate companies (e.g., Equiva, the services intermediary formed to meet the needs of both Equilon and Motiva) may not have been fully consummated until around April, 1998. However, both sides have consistently referred to a "formation" date of January 1, 1998. Thus, the Court also adopts this date as the effective date of formation.

17. Effective July 1, 1998, Shell and Texaco transferred U.S. marketing and refining assets west of the Appalachians to Equilon, and Shell, Texaco, Star, and SRI transferred U.S. marketing and refining assets east of the Appalachians to Motiva. *See, e.g.,* Goll testimony; Hallberg testimony.

18. As of July 1, 1998, all then-existing Shell, Texaco and Star lease and retail sales agreements were assigned to either Equilon or Motiva in their respective geographical areas of operation. *See, e.g.,* Goll testimony; Hallberg testimony.

19. In August, 1998, under the leadership of Morris and/or the direction of Styslinger, work began on development of new uniform lease and retail sales agreement(s) to be used by all retail dealers within the Equilon and Motiva network(s). *See* Goll testimony; Styslinger testimony; Morris testimony.

20. Effective August 1, 1998, Equilon terminated the Variable Rent Program ("VRP").[11] *See* Hanley testimony.

21. By September, 1998, initial work on the Strategic Marketing Initiative ("SMI") had begun. *See* Morris testimony.

22. By late October, 1998, Equilon had hired Mercer Management Consulting to assist with SMI development/implementation. *See* Exhibit 649; Goll testimony; Morris testimony.

23. During the first quarter of 1999, Equilon implemented the Los Angeles Pilot Study (the "Pilot") to investigate SMI "vision" concepts in Los Angeles. The Pilot was completed by March/April, 1999. *See* Exhibit 1025; Little testimony.

24. In March, 1999, Equilon created the Interim Rent Challenge Policy (to challenge contract rents). *See* Hanley testimony.

25. By April, 1999, the uniform lease and franchise agreement(s) were ready. *See* Hallberg testimony; Styslinger testimony.

26. During the summer of 1999, the new agreement(s) were being used for new lessee-retailers (franchisees not previously contracting with the alliance). *See* Styslinger testimony.

27. By September, 1999, the new agreement(s) were introduced for renewals of existing franchises in at least one region of the Equilon/Motiva network (reportedly in Houston, not yet in the Los Angeles/PSR area).[12] *See* Styslinger testimony.

28. By late in the fall of 1999, the Los Angeles RPS (Regional Planning System) was being implemented. This was a further analysis of the application of SMI principles to the Los Angeles/PSR market. The Los Angeles RPS was completed by February, 2000. *See* Exhibit 1016; Hallberg testimony.

---

11. The VRP will be discussed in more detail below. *See infra* ¶¶ 102–110. In brief, VRP was a program run by Shell (from about 1982), prior to formation of the alliance, under which lessee dealers could receive discounts on station rent for meeting certain volume standards for total sales of petroleum products. The VRP program was never an actual term of the dealers' contracts, was unilaterally made available by Shell to encourage more franchisers, and was always terminable at will upon thirty (30) days' notice. *See, e.g.,* Hanley testimony.

12. The Pacific South Region ("PSR") is one of approximately five geographic sales regions into which the Equilon network is divided; as of 1999 the other four sales regions within Equilon were the Pacific Northwest Region, the Southwest Region, the Chicago Region, and the Midwest Region. *See* Little testimony. Until recently, the southern border of the PSR was the Orange County line; the northern boundary is Fresno County. *See id.* Orange County was previously in the Southwest Region, but was recently switched to the PSR. *See* Morris testimony.

29. In March of 2000, Equilon introduced the new agreement(s) to PSR lessee-dealers, including Plaintiffs. Accompanying the new agreement(s) sent to lessee-dealers to whom a renewal under the new agreement(s) was offered was a cover letter stating in bold: **"If you do not sign and return the Lease and other enclosed documents in a timely manner, be advised that Equilon will issue without further warning a non-rescindable notice of non-renewal ..."** Exhibit 1143.

30. Unless a Plaintiff or other lessee-dealer executed the new agreement(s) "as is," they were informed that Equilon would terminate that lessee-dealer's franchise. In response to questions about individual terms of the new agreement(s), dealers (e.g., Plaintiff Buczkowski in a conversation with Goll) were told that there would be no negotiation of the terms of the new agreement(s). *See, e.g.,* Goll testimony.

31. On May 22, 2000, Plaintiffs filed the instant Complaint.

32. On August 18, 2000, and on September 11, 2000 (Amended), this Court entered Findings of Fact and Conclusions of Law, and a Preliminary Injunction which, *inter alia,* enjoined Equilon from terminating the existing lease or retail sales agreements of those Plaintiffs who refused to sign the new agreement(s) proffered in or around March, 2000, or from taking any further actions toward such termination, or from failing to renew Plaintiffs' franchises on this basis, or from taking any further actions toward such non-renewal, or from engaging in any retaliatory conduct against Plaintiffs designed to establish pre-textual grounds for termination or non-renewal of Plaintiffs' franchises. *See* Amended Findings of Fact and Conclusions of Law and Preliminary Injunction ("Amended Preliminary Injunction") at 19–20; Docket No. 68. Ac-

cordingly, no Plaintiff has signed the new agreement(s).

33. In the Amended Preliminary Injunction, the Court found there was a chance that certain provisions of the new agreement(s) violated 15 U.S.C. § 2805(f), inasmuch as they conditioned renewal on waiver of rights protected by state or federal law; other provisions clearly did not. *See id.* at 11–13.

34. On April 23, 2001, this Court issued an Order granting in part and denying in part Plaintiffs' and Defendant's cross-motions for summary judgment (the "Summary Judgment Order"). In that Summary Judgment Order the Court found, *inter alia,* that Equilon could not condition renewal of the franchise relationship on agreement to several provisions in the new agreement(s) which constituted a waiver of lessee-dealers' rights under state or federal law: the Release provisions, the Statute of Limitations provisions, and the Limitation of Liability provision. Inasmuch as these provisions (and the new agreement(s) in general) had been presented on a "take it or leave it" basis to lessee-dealers, without room for negotiation, the Court concluded that this constituted a violation of Section 2805(f) (15 U.S.C. § 2805(f)) of the PMPA. *See* Summary Judgment Order at 21–22; Docket No. 238.

35. In its April 23, 2001 Summary Judgment Order, this Court also concluded that conditioning renewal on certain other provisions identified by Plaintiffs did *not* constitute a violation of Section 2805(f) of the PMPA: the ADR provision, and the Attorneys' Fees provision. *See id.* at 23. In its Summary Judgment Order, the Court determined that it was also possible that the Trial Franchise clause and/or the Transfer Fee provision violated the strictures of Section 2805(f), but that this issue was not adequately briefed to render a

decision at that time. *See id.* The Court also left to be decided at a later stage the issue of whether and/or which of the provisions violative of Section 2805(f) might be severable from the agreement(s). *See id.* at 24.

36. In or around May, 2001, Equilon prepared and distributed to relevant decision-makers a Report on its "Los Angeles Study" which was begun in January, 2001. *See* Exhibit 755; Burrow testimony. The "Los Angeles Study" (actually titled the "Equilon Los Angeles Market Retail Strategy Review") was a further strategic analysis of the Los Angeles market with conclusions and recommendations (similar to SMI and/or RPS).

37. In June, 2001, as an apparent implementation of some of the conclusions and recommendations of the Los Angeles Study, Equilon sent offer solicitation letters to certain lessee-dealers within the Los Angeles area/PSR; some Plaintiffs received letters. *See* Exhibit 21. These letters stated that Equilon was considering a buy-out of the franchises/franchise relationships at the locations contacted, under the mutual cancellation provisions of the PMPA, and invited the franchisees to submit written offers to Equilon setting forth the basis/acceptable price for a buy-out and mutual cancellation, within thirty (30) days of the date of the letter. *See* Exhibit 21 (dated June 15, 2001). The letters reserved to Equilon sole discretion to accept or reject any offer, and stated that a response from Equilon to any offer submitted could be expected within sixty (60) days. *See id.*

38. Also in June, 2001, Equilon and Motiva sent out to all of their lessee-dealers (and OROs) an "RFL Universal Amendment" and an "RSA Universal Amendment" which changed or deleted several provisions at issue in this case. The Amendment(s) were delivered to all dealers who previously signed the new agreement(s). *See* Exhibits 1060–1063; Goll testimony.

39. These Amendment(s) made/make the following changes to the new agreement(s): (1) both the Release and General Release provisions are deleted; (2) the ADR provision is deleted; (3) the Limitation of Liability provision is deleted; and (4) the Statute of Limitations provisions are deleted. In addition, (5) the Attorneys' Fees provision is revised to provide recovery by the *prevailing party* (no longer limited to Equilon); (6) the Trial Franchise clause is revised to modify the class of transferees to which franchises can be transferred without triggering the trial franchise option; (7) the Transfer Fee provision is revised to clarify that the applicable percentage applies only to the *gain* realized by transfer; (8) the Minimum Gallonage provision is revised to clarify that failures to meet minimum quantities due to matters beyond the retailer's control are not grounds for termination and that volume adjustments may be made based on such circumstances in the alliance's sole discretion; and (9) the Ancillary Use provision is revised to clarify that the alliance companies' right to limit future authorized uses on a leased premises aside from motor fuel sales upon transfer applies only to ancillary uses, not to convenience stores, food marts, car washes, or snack shops.[13]

---

**13.** Of these provisions, this Court had previously found that the renewal of lessee-dealers' franchises could not be conditioned on the franchisees' capitulation to the Release, Statute of Limitations, and Limitation of Liability provisions. *See* Summary Judgment Order at 21–22. However, the Court had also previously concluded that the ADR and Attorneys' Fees provisions in the new agreement(s) did *not* constitute violations of 15 U.S.C. § 2805(f). *See id.* at 23. Further, the Court had not previously drawn any definitive conclusions as to the validity of the Trial Franchise clause or Transfer Fee provision. *See id.; see also infra* Conclusions of Law ¶¶ 28–45. Lastly, the Court has had no prior *opportunity* to make any finding as to the validity

40. The amendments to the new Trial Franchise and Transfer Fee provisions may be worth some more specific description(s):

(a) The new Trial Franchise clause changes the "class" of proposed transferees with regard to whom the alliance companies may require a termination/trial franchise to those who have not, in the last *five years*, been a retailer for Equilon/Motive *or for a major oil company, authorized to sell branded petroleum products:*

Except to the extent limited by applicable Law, if [the lessee] desires to Transfer its interest in this Agreement to an individual or Business Entity that has not previously operated as a retailer of [Equilon or its affiliates or] *a major oil company authorized to sell the company's branded petroleum products within the 5 year period preceding the Effective Date of this Agreement,* then [the lessee] may be required to execute a mutual termination of this Agreement and the proposed transferee may be required to execute a trial franchise agreement as a condition to ... consent ...

Exhibit 1060 (emphasis added) (amending RFL Part II, Art. 18(b); RSA Part II, Art. 22(b)).

The apparent effect of this amendment is to *expand and contract* the class of transferees to whom transfer may be effected without the possibility of termination and a trial franchise agreement being required. Where the prior version gave Equilon/Motiva the discretion to require termination and a trial franchise wherever a proposed transferee had not previously operated as an alliance franchisee *at any time,* the new version limits this discretion to withhold consent to a transfer to those cases where a proposed transferee has not been an alliance (*or* other major oil company) franchisee *within the 5 years prior to the agreement(s).* This *expands* the pool of unrestricted transferees on the one hand: where Equilon/Motiva could previously withhold consent to a transfer (absent termination and entrance into a trial franchise) where a proposed transferee had been a franchisee of another major oil company, so long as the transferee had never been an alliance franchisee, now Equilon/Motiva has no such discretion so long as the proposed transferee was a franchisee of another major oil company within the 5 years preceding the Agreement. On the other hand, this revised version of the Trial Franchise

under Section 2805(f) of the Minimum Gallonage and Ancillary Use provisions. Thus, although Equilon's action in promulgating these Amendment(s) may have been *in part* a reaction to this Court's previous rulings, it cannot be wholly attributed to that motivation. Accordingly, this must also be taken into account in assessing Equilon's "good faith" in development (and amendment) of the new agreement(s). The stated reason(s) for the Amendment(s) given in the accompanying cover letter which was sent to signatory-dealers in or around June, 2001 include the following:

While acceptance of the RSAs and RFLs has been extremely high, with over a year

of experience ... and the benefit of feedback from retailers, the Company now believes that certain changes in the RSAs and RFLs will simultaneously enhance their acceptance by the retailer network and allow the Company to meet its business objectives.
Exhibit 1060. The cover letter indicates that the Amendment(s) are to be effective in agreements prepared after July 1, 2001, and that "the Company is offering retailers who have executed new agreements ... an opportunity to amend ... to incorporate these changes." *Id.*

clause also serves to *contract* this class of "unrestricted" transferees somewhat, by operation of the new 5-year limitation on prior franchisee status: under the original version, so long as a transferee has *ever* been a franchisee of an alliance company, there is no "trigger" under this clause for Equilon/Motiva to opt to require a termination/trial franchise; under the new version, however, the proposed transferee has to have been a franchisee of an alliance company (or some other major oil company) *within the last 5 years*. A proposed transferee who was a franchisee of an alliance company 6 or more years prior, therefore, would not invoke Equilon/Motiva's discretion to require a trial franchise under the original provision, but this same transferee would "trigger" the new version thereof.

(b) The new Transfer Fee provision is less of a change to the prior version than it is a clarification that the transfer fee will be the greater of $6,500.00 or the amount arrived at by multiplying the "gain" in Gross Sales Price (i.e., the *difference* between the Gross Sales Price paid for the franchise originally and the Gross Sales Price paid for the current transfer) by a declining percentage based on the current franchisee's tenure (same percentages as before: 35% for 0–3 years, 20% for 3–6 years, 15% for 6–9 years, 0% for 9+ years). *See* Exhibit 1060 (amending RFL Part II, Art. 18(e)).

41. Trial of this case began on July 3, 2001. The trial lasted for nine court days, until July 18, 2001. At that point, the Court took the matter under submission for decision.

**The Focus of Plaintiffs' Case and the Court's Conclusion(s)**

42. As it unfolded at trial, Plaintiffs' case focused on what Plaintiffs argued was a "three-pronged attack" on lessee-dealers within the Equilon (and Motiva) network designed to drive the lessee-dealers out of business, to convert their stations to company-operated outlets, and to do so without incurring the cost inherent in buy-outs of lessee franchises in compliance with the PMPA. Plaintiffs essentially argued:

(a) that the SMI was the start of a process of study *and tactical planning* by Equilon/Motiva the *main* purpose of which was to evade restrictions of the PMPA by *forcing* lessee-dealers into destitution, so they would either go entirely out of business or would offer their stations for purchase by the alliance companies at bargain prices;

(b) that this plan of attack was implemented on three or more fronts-(a) drastically increasing rent in the new agreement(s); (b) conversions of ROROs to COROs and SOROs; and (c) onerous terms in the new agreement(s) designed to devalue franchises; and

(c) that Equilon/Motiva succeeded in driving lessee-dealers into financial difficulties, and/or out of business entirely, by featuring a combination of high rents and high gasoline prices unprecedented in the franchisee/retail petroleum industry.

43. The Court concludes that the evidence presented at trial did not bear out Plaintiffs' hypothesis that the non-renewals of Plaintiffs' franchises inherent in the "take it or leave it" presentation of the new agreement(s) to Plaintiffs (and to other lessee-dealers in the PSR) in March, 2000 violated the PMPA. As will be revealed by what follows, Defendant met its

burden of showing that these non-renewals were a result of a failure to agree on changes/additions to the franchise which arose "in good faith" and "in the normal course of business," and not for the purpose of preventing renewal.

### The Purpose and Effect of the Strategic Marketing Initiative ("SMI")

44. Equilon and Motiva (the "alliance companies") were formed retroactively on January 1, 1998. Soon after their merger, the alliance companies engaged in a self-study and planning process focused on creating or maintaining a competitive advantage. The alliance companies recognized that each of their major predecessors (Shell and Texaco) had suffered poor market performance in recent years. They engaged in a full-scale analysis and critique of their business model(s) in order to remedy merger and strategic issues and to gauge how best to market the Shell and Texaco brands. The first step of this study and planning process was the Strategic Marketing Initiative ("SMI"). *See, e.g.,* Morris testimony.

45. The SMI was a general business plan and a series of studies designed to provide direction for the alliance companies' network of retail outlets. *See* Goll testimony; Exhibits 480.1, 484, 766, 1019, 1020, 1028, 1072. SMI studies were to be employed alliance-wide, throughout Equilon and Motiva markets. *See* Hallberg testimony. The primary "challenge" to which SMI was addressed was the increasingly competitive market for retail gasoline sales which had emerged during the 1990s. Gasoline margins were shrinking, to the point that the alliance companies had determined it was necessary to shift from being solely dependent on gasoline margins for profitability. *See, e.g.,* Morris testimony; Exhibit 1028.

46. The alliance companies began work on SMI by September, 1998, in response to their perception that they had fallen behind their competitors. *See* Morris testimony; Little testimony.

47. To assist them in developing strategies and recommendations to respond to the perceived challenges and constraints of the petroleum marketing industry, the alliance companies hired/worked with an outside consultant, Mercer Management Consulting ("Mercer") to develop SMI recommendations. The contract with Mercer had been entered into by October, 1998. *See* Little testimony; Morris testimony; Exhibit 649.

48. SMI looked at the petroleum marketing business on a large scale, with an eye toward developing a "vision," or set of recommendations, for the alliance companies to apply in the various markets within their network. SMI also looked at the companies' channels of distribution (e.g., ROROs, COROs, SOROs, OROs, and WOROs), their operations, and how best to enhance the Shell and Texaco brand identities. *See, e.g.,* Hallberg testimony; Morris testimony; Exhibits 1019, 1020.

49. This initial SMI work in late 1998 and early 1999 developed a series of recommendations. These recommendations were subject to validation in the various markets in which the alliance companies operated. The SMI called for detailed market analyses in each geographic region (e.g., the PSR) within the alliance: these Regional Planning System ("RPS") studies modeled SMI objectives in each market. *See, e.g.,* Hallberg testimony; Turner testimony; Morris testimony.

50. Among the overall recommendations developed in the SMI and tested via the RPS was a goal of increasing the "resilience" of Shell and Texaco branded retail stations. A station is more "resilient" if it is less dependent on gasoline profit margins due to the presence of APCs. *See* Goll testimony.

51. Within the alliance, the primary APCs were considered to be convenience stores ("C-stores"), car washes, and fast food restaurants ("QSRs"). *See* Goll testimony; Morris testimony.

52. In other words, one oft-stated goal of the SMI (and RPS) was for the alliance companies to "transform our business model from a *branded gasoline supplier* to a *convenience retailer*." Exhibit 1028 (emphasis in original); *see* Elston testimony.

53. As a result of SMI (and RPS), each geographic market within the alliance network was given one of five designations to reflect the general strategic approach to that region: each region was classified either "Defend," "Strengthen," "Grow," "Hold," or "Restructure." The SMI recommendations for each classification varied. These classifications governed the general strategic approach to the region via SMI and RPS, though a region's classification was subject to change. *See* Hallberg testimony; Exhibit 1019. The Los Angeles market/PSR was given a "Strengthen" designation by SMI. *See id.*

54. Within the Pacific South Region, the Los Angeles RPS focused on analysis of three SMI objectives: market leadership, resilience, and consistency. *See* Hallberg testimony. The RPS conducted in the PSR accomplished its study of these goals applied to the PSR market area by breaking the Los Angeles market geography down into separate sub-regions, or Strategic Network Plans ("SNPs") and then evaluating Equilon performance in each region by comparing Equilon retailers to all competitors. *See* Exhibits 1016–1018. The results of these studies were then used to develop a marketing plan for Equilon throughout the PSR. *See* Hallberg testimony.

55. The pricing of gasoline to dealers was not part of SMI/RPS or the subjects studied therein. During trial, Plaintiffs relied nearly exclusively on Exhibit 619, an email written by Luciani (Pricing Manager for the PSR) dated November 2, 1999, as evidence that the SMI and the alliance companies' (later) pricing decisions were interrelated. In the email, Luciani references the "pricing side of SMI." Exhibit 619. However, this stray comment is the only evidence adduced of any linkage between pricing and the SMI. On both direct and cross-examination, Plaintiffs' counsel asked several Equilon employee-witnesses what they knew regarding a "pricing side of SMI." Each witness consistently testified that there was no pricing component to the SMI study. *See, e.g.,* Little testimony; Hallberg testimony; Luciani testimony. Moreover, Luciani testified credibly that the "pricing side" noted in Exhibit 619 was only meant to describe his specific business team, and was not a reference to a pricing component of the SMI. Luciani also explained that the November 2, 1999 email was sent in response to concerns regarding problems arising from the merger of Shell and TRMI computer *databases,* and his fear that his team, "the pricing side of SMI," would be left out of planning. *See* Luciani testimony. The Court found this explanation credible, particularly in view of the computer-based references Luciani described in the balance of the email and the near total lack of any other evidence suggesting a linkage between SMI and pricing methodologies.

56. In brief, the SMI/RPS process was an effort to engage in strategic planning at a macro level. *See* Goll testimony.

57. Several witnesses testified that many of the larger goals of SMI/RPS were never actually implemented, as what had seemed possible at an abstract level became difficult to implement in light of economic realities at the local level. *See, e.g.,* Morris testimony; Goll testimony; Hallberg testimony.

58. For instance, one of the primary ideas which arose out of the SMI/RPS process was to emphasize within certain markets, including the Los Angeles market/PSR, company operated sites (COROs and SOROs) as well as two *new* marketing "channels," known as Territory Developer Alliances ("TDAs") and Total Site Franchises ("TSFs").[14] The TDA channel was intended to be an extension of the wholesale class of trade (WOROs), in which Equilon/an alliance company would enter a partnership with a wholesaler to develop an entire area or territory by investing in APCs (e.g., car washes, QSRs, C-stores) on the retail sites. The TSF channel was designed specifically as an "opportunity" for ROROs and OROs, whereby a RORO or ORO and an alliance company would enter into a joint venture of sorts, featuring joint investment in APCs, revenue-sharing (including revenues derived from these APCs), and greater financial/technical support from the alliance. *See, e.g.,* Exhibit 1020; Hallberg testimony; Little testimony.

59. As part of its "Strengthen" classification, under SMI/RPS the Los Angeles market/PSR was to focus on company operated stations, TDAs, and TSFs as its preferred classes of trade. *See, e.g.,* Exhibits 1036, 1072; Goll testimony.

60. However, several witnesses testified that the TDA and TSF "channels" never actually materialized, either in the Los Angeles market or anywhere within the alliance companies' network. *See, e.g.,* Burrow testimony; Runnels testimony; Hallberg testimony; Morris testimony. The Court found the conclusion offered by these witnesses that many of the SMI "vision" concepts were never realized quite credible.

61. Another recommendation arising out of the SMI/RPS process which *was* more readily implemented was an effort to achieve an "optimal channel mix" within each geographic market. In the Los Angeles market/PSR this included greater emphasis on company operated stations (COROs and SOROs), because there was a larger return on investments in APCs at these sites. *See, e.g.,* Exhibit 1020; Goll testimony; Hallberg testimony. However, several witnesses credibly testified that it was *not* part of SMI/RPS to do away with lessee-dealer stations (ROROs) entirely. *See* Goll testimony; Hallberg testimony; Morris testimony. Several employee witnesses emphasized that the RORO class remains vital to the alliance.

62. As part of this effort to achieve an optimal channel mix, SMI/RPS further recommended site-by-site studies to assess whether it might be beneficial to "convert" a station from one "channel" to another. This recommendation contemplated some conversions of ROROs to COROs or SOROs, though it was not directed at any specific sites (i.e., it was a network-wide recommendation). *See* Elston testimony; Exhibit 1019. It was anticipated that these conversions would require the buy-out of RORO dealers' franchises. *See* Exhibit 1019.

63. In the Los Angeles market/PSR the site-by-site optimization study/implementation process was called "Project Genesis." *See* Hallberg testimony; Exhibit 1026. Project Genesis files were created for each of the retail sites within the PSR, with recommendations for optimizing performance at each of the sites studied. These suggested changes included adding APCs, rebranding flags, and "divesting" (i.e., selling off), "rationalizing" (i.e., closing down), or "converting" (i.e., changing

---

**14.** TSFs were also known as "Virtual Site Franchises" ("VSFs"), in the PSR, and/or were also called "CORO IIs." *See* Little testimony.

the channel of trade) underperforming sites. *See, e.g.,* Exhibit 1019; Hallberg testimony; Turner testimony.

64. A number of conversions which were anticipated did involve conversions of ROROs to COROs or SOROs. This could arise, for example, in a situation where a particular site could be made more "resilient" by adding an APC but where it would not be economical for the alliance company to make a large capital investment if its only return would be added rent. *See, e.g.,* Goll testimony; Hallberg testimony; Exhibit 1019.

65. All of the employee witnesses consistently testified that the PMPA represented a real world constraint on any move they might try to make that would affect lessee-dealers or open retailers (ROROs or OROs) with whom they had entered into retail sales agreements (franchisees). The Court also found credible their consistent conclusion, contrary to the claim made by Plaintiffs, that references in SMI documents to PMPA constraints were a *recognition* of these restrictions, rather than an attempt or intent to *evade* PMPA limitations, either in conversions of stations or otherwise. *See, e.g.,* Exhibits 1020, 1072; Goll testimony; Hallberg testimony.

66. As one example, it was largely anticipated that conversions, divestments, or rationalizations of lessee-dealer stations would be accomplished within the constraints of the PMPA. *See, e.g.,* Goll testimony; Hallberg testimony. Moreover, to the extent the TSF "concept" was discussed at an abstract level, several witnesses credibly testified that it was the alliance companies' assumption that the new TSF agreements which were to be proposed to ROROs and OROs would include a retention of their PMPA rights. *See, e.g.,* Goll testimony.

67. There is no direct evidence that SMI was designed either to circumvent the restrictions of the PMPA, or for the explicit purpose of wholesale conversion of large numbers of lessee-dealer stations (ROROs) to company operated stations (COROs or SOROs). For instance, as Goll credibly testified, it was not the *purpose* of SMI to substantially decrease the number of ROROs within the overall network, though it was possible that SMI (and/or the various layers of its implementation) might have that *effect. See* Goll testimony. However, every employee witness with the opportunity to do so emphasized that greater emphasis on company operated retail outlets did not *preclude* a continuing, vital, RORO class of trade. *See* Goll testimony; Hallberg testimony. There is no dispute that the SMI called for less emphasis on the RORO class of trade, in an effort to find the "optimal channel mix." *See* Hallberg testimony. However, the Court finds that merely adopting a business model that prefers a certain channel of trade over another, even when it might impact a lessor non-preferred channel, is not conduct violating the PMPA.

68. Plaintiffs cited no compelling evidence in support of their theories that SMI was designed to circumvent the PMPA and/or that its primary purposes included large-scale conversion of RORO sites to CORO or SORO operations. The exhibits which were cited by Plaintiffs contained, at most, ambiguous and non-specific statements which were equally likely to have innocent explanations as they were to indicate any "evil motive" on the part of Equilon/the alliance. *See* Exhibits 411, 439, 458, 480.1, 484, 507, 618–620, 644, 649, 649.1, 654, 766, 1019, 1025, 1028, 1046, 1053, 1067, 1072. As one example, Plaintiffs relied heavily on a single line of text found in Exhibit 633 (a report apparently prepared during the course of SMI by Luciani, prior to a pricing managers meeting in Las Vegas in May, 1999) to show that it was the specific *objective* of SMI to convert lessee-dealer stations into COROs

and SOROs. The pertinent portion of the Exhibit reads: "More and more SORO/CORO stations will be coming on stream." However, as Luciani credibly testified at trial, this document had nothing to do with *conversions;* the quoted line speaks to the merger of Shell and Texaco databases, and to increases in the numbers of COROs and SOROs that were appearing in on-line *records.* *See* Luciani testimony.

69. All of the employee witnesses testified that there was no direct linkage between SMI and the development or roll-out of the new agreement(s). *See, e.g.,* Goll testimony; Little testimony; Styslinger testimony; Morris testimony. Indeed, aside from their from proximity in time, there is almost no linkage at all between SMI/RPS and the new agreement(s).

70. Even if there were such linkage, the evidence on SMI does not further Plaintiffs' effort to establish that the new agreement(s) were developed as part of a coordinated scheme to drive RORO dealers out of business. Plaintiffs have not shown that SMI was designed to circumvent the PMPA, nor that it contemplated wholesale conversion of ROROs. If anything, all the evidence regarding SMI establishes that Equilon/the alliance companies *recognized* PMPA constraints, and sought to work *within* those constraints to realize goals identified by SMI. Moreover, SMI remained always an abstract "vision" that was never fully implemented. As one example, neither of the two *new* "channels of trade" envisioned by SMI (or perhaps only by the consultants at Mercer)-the TDA and the TSF-were ever implemented. As several witnesses stated, SMI was based on a consultant's organizational charts combined with hopeful economic optimism, but it collided with day-to-day re-

ality. *See* Hallberg testimony; Morris testimony.

71. Economic realities ultimately forced the alliance companies to largely abandon the goals and recommendations of SMI, by late 2000, when it became evident that the plan's capital earn-up would be insufficient to justify pursuing it any further. *See* Burrow testimony. As of January, 2001, the alliance companies (and more specifically, Equilon) began moving away from SMI toward the formation of a new strategic plan, formulated in the PSR as the "Los Angeles Study." *See* Burrow testimony; Goll testimony; Hallberg testimony. The draft report of the Los Angeles Study was distributed to primary decision-makers in May, 2001. *See* Exhibit 755.

### Achieving the "Optimal Channel Mix" Within the Alliance Network(s)

72. As has been stated, one point that Plaintiffs consistently established, and which Defendant does not dispute, is that one goal of SMI was to emphasize the company operated class of trade (COROs and SOROs) while de-emphasizing the lessee-dealer class of trade (ROROs) and/or open dealers (OROs). *See, e.g.,* Exhibit 1019; Elston testimony. One SMI document on which Plaintiffs heavily rely even anticipated that the proportion of ROROs in the Los Angeles/PSR market might go from approximately 65% of the total channel mix to 35% of the total stations. *See* Exhibit 1019; Elston testimony.[15]

73. There *has* been a significant reduction in the total number of RORO stations within the Equilon dealer network since the formation of the alliance. From approximately 2,200 ROROs within the Equilon network (1,805 were Shell dealers and

---

**15.** It is worth noting that this document (Exhibit 1019) also puts great emphasis on a significant market entry of the "new" TSF class of trade, which never came to pass.

Therefore, this market *estimate* must be taken as no more than that, and not read as a realistic prediction.

371 were Texaco dealers) as of May, 1998, the number declined to approximately 1,500 ROROs within that same network as of the latest figures available (from November, 2000). *See* Goll testimony; Styslinger testimony; Plaintiffs' Exhibit 13.

74. Plaintiffs contend that this decline in the number of ROROs is sufficient evidence in itself of Defendant's bad faith attempts to drive the RORO class of trade out of business, and/or to convert RORO stations to company operated outlets. However, simply looking at the gross numbers lost from the RORO class of trade is deceiving, for several reasons.

75. First, several witnesses testified that the number in this class which was "converted" to the CORO or SORO class of trade is significantly smaller than the total. Though the estimates varied somewhat, it appears that the number which moved directly from being RORO stations to COROs or SOROs was somewhere between 200 and 400 during this period. *See* Goll testimony; Little testimony; Exhibit 1019. Thus, it appears that between 10–20% of RORO stations in the Equilon network became COROs or SOROs from May, 1998 to November, 2000. The remainder were either sold out of the network entirely, sold to wholesalers or retailers, closed, or just withdrawn from the market. *See* Goll testimony (estimating that 300 of the RORO stations were sold out of the network).

76. Second, it appears that this drop in the number of ROROs in the Equilon network accompanied similar changes in the mix of stations overall, such that the *percentage* of ROROs in the Equilon network has declined much less. For instance, at the formation of the alliance in 1998 the RORO class of trade represented approximately 65–70% of retail stations in the Equilon network (2,200 out of a total of approximately 3,100 to 3,400 retail stations). *See* Goll testimony; Little testimo-

ny. As of the last quarter of 1998, RORO stations also made up approximately 70% of the stations within the PSR (511 out of a total of 725 retail stations). *See* Little testimony; Exhibit 1067. Though no overall percentage for the current mix of retail stations in the overall Equilon network was presented, the *percentage* of ROROs in the PSR has diminished less notably since the formation of Equilon.

77. In the latest numbers available, for instance, the figures reported in the Los Angeles Study and/or testified to by witnesses familiar with the retail station breakdown show that ROROs presently make up 58% of the total PSR mix (400 stations). *See* Exhibit 755; Hallberg testimony. Moreover, estimates of an optimal mix which might arise from the Los Angeles Study if all of its recommendations are implemented put the PSR mix at 59% RORO, *up* a percentage point from the current mix as reported in the Los Angeles Study. Thus, ROROs were and are projected to remain a majority of the stations in the Equilon network of retail stations. Again, as several Equilon witnesses testified, there was never any goal (of SMI, or of Equilon in general) to wholly *replace* the RORO class of trade, or to implement a *single* class of trade to the exclusion of all others. *See, e.g.,* Murdock testimony. This testimony is borne out by these numbers.

78. Third, and most important, even if the drop in the number of ROROs were on its own suspicious, there was absolutely *no* evidence presented that any of the roughly 700 stations in the Equilon network (or the roughly 110 stations within the PSR) which dropped out of the RORO class of trade did so under any circumstance that might constitute a violation of the PMPA. Specifically, buy-outs, withdrawals, and sales of retail stations are clearly contemplated and permitted by the PMPA. Plain-

tiffs adduced no evidence that *any* of the activities which led to changes in the overall station mix within Equilon or within the PSR was unlawful, or that they resulted from anything other than proper business judgment.

79. More to the point, Plaintiffs drew absolutely no connection between the promulgation of the new agreement(s) and this decline in the number of ROROs in the Equilon network, other than vague assertions that they were all part of Equilon's strategy to drive out the lessee-dealer class of trade. In support of their argument that Equilon systematically sold, divested, and converted RORO sites with the express purpose of *eliminating* this class altogether, Plaintiffs again rely on a multitude of ambiguous statements in trial exhibits, including Exhibits 13, 439, 618, 620, 649, 752, 757, 766, 1019, 1020, 1046, 1053, 1065, 1072, and/or 1161. Again, however, the Court does not find the "smoking gun" in these documents that Plaintiffs claim they contain. Rather, the Court finds that the documents cited (and quoted repeatedly into the trial record) mostly contain ambiguous statements of minimal probative value along the lines of "don't get cold feet," and "transition partners with a carrot . . . and stick approach." Exhibits 649, 1020. At most, Plaintiffs simply established a point which Defendant does not dispute: that Equilon planned to de-emphasize the RORO class of trade and hoped (and managed) to divest and convert a number of these sites. Because de-emphasizing a class of trade and even converting a number of sites does not necessarily lead to a finding of bad faith, the Court simply cannot agree with Plaintiffs' contention that the drop in the number of RORO stations is *per se* evidence of Defendant's bad faith. This is particularly true given the complete lack of linkage between this de-emphasis on ROROs and the new agreement(s).

80. Numerous employee witnesses testified that one of the SMI's chief concerns had been fostering a better channel mix for Equilon's network of retail outlets. Achieving an "optimal channel mix" would necessarily entail site upgrades, sales/divestitures, and conversions. *See* Goll testimony; Mustain testimony; Hallberg testimony; Little testimony; Burrow testimony; Hanley testimony; Exhibits 439, 622, 738, 1019, 1072. All these witnesses testified that any decision to upgrade, divest, or convert any station (including a RORO site) was made only after much careful deliberation, as most obviously exemplified by the Site Optimization Scorecards completed during RPS. *See* Exhibit 1065. Hallberg testified that Site Optimization Scorecards were completed for each of 700 individual sites, made up of approximately 30 separate calculations for each site. *See* Hallberg testimony. These detailed studies (and their further review for the PSR/Los Angeles market during Project Genesis) determined whether Equilon should invest in any particular site, and estimated the amount of revenue that could be expected once a given level of investment was made. In many cases, the projected "best case" was divestiture of an under-performing site, when no amount of return would justify the necessary investment. With these studies, Equilon hoped for "resiliency" within its network of retail outlets, so that the company would be competitive in a market where revenue from mere sales of gasoline decreased. *See* Goll testimony; Burrow testimony.

81. Again, many witnesses testified that decisions to convert, divest, or upgrade were made on a site-by-site basis.

82. For instance, Goll testified that as the Business Operations Manager in Sales and Marketing for Equilon, he never heard of or participated in any discussion on the

topic of exiting the RORO class of trade, altogether. *See* Goll testimony. Plaintiffs also introduced deposition testimony from Murdock in which he stated that "there will always be all classes of trade" within the Equilon network. *See* Murdock testimony. Murdock also specifically testified that it was understood that any "conversions" which were contemplated would have had to be voluntary, under the PMPA. *See* Murdock testimony.

83. Indeed, Plaintiffs' individual experiences bear out this analysis. All of the Plaintiffs who testified (with the possible exception of Plaintiff Mantri)[16] that they had been approached about possibly converting their station(s) to a CORO (or SORO) arrangement (by being bought out of their PMPA franchise rights) stated quite clearly that they were never *pressured* to convert to a company-operated station. *See* Maksimous testimony; Sislian testimony; Abel testimony; Buczkowski testimony; Merhi testimony; Daghur testimony; Parungao testimony; Kaplan testimony; Kashaniroth testimony; Uellner testimony; Rabadi testimony; Terlsian testimony; Wilson testimony; Delgado testimony. In fact, more than one Plaintiff actually testified to *proposing to Equilon* that it convert their stations into COROs, but having their requests denied. *See, e.g.,* Dagher testimony; Mantri testimony.

84. Plaintiffs' own testimony is consistent with the employee witnesses' testimony that station changes were determined on a site-by-site basis, regardless of whether the site was then a RORO, a SORO, a CORO, or an ORO. *See* Goll testimony.

85. Plaintiffs presented no evidence establishing any *direct* connection between the SMI, the site-by-site conversions, divestments, and closures, and the new dealer agreement(s). Even assuming that such a connection existed, however, the combined evidence of the SMI/RPS process and the subsequent site-by-site optimizations of dealer stations within the Equilon network does not demonstrate any bad faith intent on Equilon's part, or an overarching purpose of converting the entire RORO class of trade to company-operated outlets. If anything, the SMI and RPS evidence, along with all the other efforts to study individual stations to achieve an "optimal channel mix," reveal that Equilon engaged in deliberate and rational decision-making, conducted numerous studies, and compiled detailed market analyses before making upgrades, conversions, and/or divestments on a site-by-site basis. This was a classic example of the exercise of reasonable business judgment on the part of Defendant Equilon, and does not suggest that Equilon created the new agreement(s) as a "pretext" or "sham" to enable its underlying motives.[17]

86. The Court therefore finds that neither the SMI/RPS process nor the loss of RORO stations is indicative of bad faith.

**Development, Roll–Out, and Acceptance of the New Agreement(s)**

87. Indeed, Plaintiffs consistently failed to tie the bulk of the evidence presented to what ought to have been the main focus of their case: the actual development and subsequent roll-out of the new dealer agreement(s) under Equilon. In fact, Plaintiffs presented little to no evi-

---

16. Mantri's testimony was ambiguous as to the *initial* overture on possible conversion; she later testified that *she* sought to convert to a CORO station, but was turned down by Equilon. *See* Mantri testimony.

17. This finding does not of course indicate the Court's agreement with Equilon's business decisions. The Court, however, cannot second-guess those decisions or substitute its own business judgment for that of Equilon. The Court's task is far more limited under the PMPA.

dence refuting the evidence presented by Defendant that these agreement(s) were the result of a specific "good faith" decision by the alliance to create a uniform dealer agreement to be used with all stations within the Equilon/Motive network, or that the new dealer agreement(s) were the result of a regular decision-making process by which an appointed team largely *combined* terms which had appeared in the agreements of the predecessor companies (e.g., Shell, Texaco, and Star).

88. As has been noted, work on the new dealer agreement(s) began in August, 1998 (one month *prior* to SMI's conception). The new agreement(s) were completed by April, 1999, rolled out to wholly new dealers in the summer of 1999, and delivered for franchise renewals in at least one market by September, 1999. *See* Styslinger testimony. They were delivered to the Plaintiffs in or around March, 2000. *See* Goll testimony.

89. The new agreement(s) were created by the alliance companies to replace the existing Shell, Texaco (and Star) papers, so as to establish uniformity between the brands by placing all dealers (ROROs and OROs) on the same franchise terms. *See* Styslinger testimony. The new dealer agreements were to be used nationwide, throughout the Equilon/Motiva network(s). *See* Styslinger testimony; Goll testimony; Morris testimony.

90. A contracts "team" was formed specifically for the purpose of examining and comparing the precise language in all of the existing contracts used by the alliance companies, and adopting the provisions that were predicted to be the most effective in the current petroleum marketplace. *See* Goll testimony; Morris testimony; Styslinger testimony; Exhibits 2, 3. Morris and Styslinger led this team, which developed the dealer agreement(s) which are at issue in this case.

91. So as to ensure uniformity, the new agreement(s) were meant to be non-negotiable, such that if a dealer chose not to sign the new agreement(s), Equilon/Motiva would issue what was termed a "non-rescindable notice of non-renewal." *See* Goll testimony; Exhibit 1143. However, each of the employee witnesses with an opportunity to do so testified that none of the contract provisions was adopted to create additional hardship for the individual lessee-dealers. *See* Styslinger testimony; Goll testimony; Morris testimony.

92. With one possible exception, each of the provisions at issue in this case may be traced back to one or more of the pre-existing Shell, Texaco, or Star agreements. The employee witnesses noted, for instance, that the Release provisions were in the old Shell contracts, the Statute of Limitations provision could be found in the old Star contracts, the Limitation of Liability provision was in both the Texaco and Star agreements, and both the old Texaco and Star franchise agreements had some form of a Transfer Fee provision, and also a similar Trial Franchise clause. *See* Goll testimony; Styslinger testimony; Morris testimony; Exhibits 2, 3.

93. Indeed, the only provision(s) at issue which may not have been in one of the prior agreements, at least not in quite the same form as they appear in the new agreement(s), are the *combination* of the Use and Investment provision and the Re–Appraisal provision. Both Styslinger and Morris stated that similar language had appeared in the previous Texaco agreements, though perhaps not in identical form. Both of these witnesses also testified that these provisions were not intended to "work together" to provide a way to drive a lessee-dealer out of business (i.e., by making significant investments/"Alterations" on a leased premises, and then increasing the lessee's rent to cover these

"Alterations"). *See* Styslinger testimony; Morris testimony; Exhibits 2, 3.

94. All employee witnesses questioned on the subject testified that they had never heard anyone refer to the agreement(s) as a means to circumvent the PMPA, or as a means to drive lessee-dealers out of business. *See* Styslinger testimony; Morris testimony; Goll testimony. Indeed, as Styslinger and Morris both explained, the new dealer agreement(s) arose from a process of "consolidation," whereby the Shell and Texaco (and Star) paper were combined into a single uniform agreement. *See* Styslinger testimony; Morris testimony. The terms in the new agreement(s) were more similar to previous Texaco and Star contracts, whereas they represented more of a marked departure from agreements previously held by Shell dealers. *See* Morris testimony; Styslinger testimony.[18]

95. As Styslinger explained, the existing Shell agreements had fallen farther behind the market trends than had the Texaco and Star agreements then in use. *See* Styslinger testimony. Accordingly, the "team" determined that it was appropriate to "borrow" more heavily from the Texaco and Star contracts. *See* Styslinger testimony. The alliance envisioned that the value of retail stations would *rise* as a result of the new dealer agreement(s). *See* Little testimony; Exhibit 1019.

96. Also "new" to the Shell-branded dealers was the methodology for charging "fair market value" ("FMV") rents calculated as a percentage of the base land value plus a percentage of the value of any improvements and equipment. This methodology had also previously been employed by Texaco and Star, so it was more of a continuance of the Texaco dealers' rent terms. *See, e.g.,* Styslinger testimony; Morris testimony.

97. The new dealer agreement(s) are the crux of the Plaintiffs' case. In order for Plaintiffs to prevail, they must show that the agreement(s) were the instrumentality utilized by Equilon to effect non-renewal of Plaintiffs' franchises in violation of the PMPA. To accomplish this end, Plaintiffs argued that the new agreement(s) were a direct or indirect result of the SMI, had the purpose of driving lessee-dealers out of business, and that Equilon/Motiva inserted numerous onerous provisions into the new agreement(s) as the means to accomplish this end. Furthermore, Plaintiffs argued that the individual lessee-dealers had no recourse or bargaining power since the new agreement(s) were presented to them on a "take it or leave it" or "as is" basis in March of 2000.

98. However, the evidence did not bear out Plaintiffs' largely unsupported assertions. There is no evidence that the SMI and the development of the new agreement(s) were related.[19] Nor did Plaintiffs present any evidence that the terms of the new agreement(s) were designed with the specific *intent* or for the specific *purpose* of devaluing franchise stations or driving lessee-dealers out of business. On the contrary, the weight of the evidence bears out Defendant's assertion of a separation between the SMI and the new agreement(s),[20] and of a "good faith" process to develop new agreement(s) through which

---

18. This may explain why there is only one Texaco-brand Plaintiff.

19. As just one example, several witnesses testified that Mercer, the management consulting firm that was so instrumental in driving the ambitious if nebulous goals of the SMI, had no involvement whatsoever in the development of the new agreement(s). *See, e.g.,* Styslinger testimony; Goll testimony; Morris testimony; Little testimony.

20. Again, even if the SMI and the new agreement(s) *were* related, or one led to the other, this would not be evidence of "bad faith."

the "team" appointed for that purpose came up with new agreement(s) which were a compilation of terms in the pre-existing alliance company agreements, in the "normal course" of its decision-making process, and without intent to prevent renewals or convert lessee stations to company operations. The evidence establishes that Equilon engaged in a careful, deliberative process, with the goal being the creation of uniform dealer agreement(s), not subject to any individual negotiation, which were to be presented to ROROs and OROs in a non-discriminatory fashion. The terms of the new agreement(s) arose out of this deliberative process in "good faith" and "in the normal course of business," absent an intent to prevent renewals or convert lessee stations.

99. Further evidence of Defendant's "good faith" is its decision to amend the new agreement(s) to reflect the decisions made previously by this court, and/or to withdraw or amend many of the provisions considered most controversial by these Plaintiffs (including several which were not determined by this Court to violate Section 2805(f) of the PMPA).[21] *See* Exhibit 1060; *supra* ¶¶ 36–38 (describing these amendments).

100. Finally, it appears that aside from the Plaintiffs involved in this case, the new agreement(s) have been accepted by the overwhelming majority of Equilon/Motiva dealers to whom they have been presented. This is further evidence that terms of the new agreement(s) are not nearly so unconscionable as was argued by Plaintiffs during the course of this trial.

101. For example, Goll testified that nationwide over 90% of the dealers that have received the new agreement(s) have signed and returned them to Equilon/Motiva. *See* Goll testimony. Morris testified that in the Southwest region (encompassing San Diego, Phoenix, Las Vegas, Tucson, Denver and, until recently, Orange County) 100% of the dealers who received the new agreement(s) signed and returned them. Even in the PSR, Plaintiffs' own geographic region, Hallberg testified that once the Plaintiffs are excluded from the numbers, well over 95% of the dealers who received the new agreement(s) have signed and returned the "new paper" to Equilon.[22]

**New Rental Structure(s) Introduced By Equilon/The Alliance**

102. The main provision in the new dealer agreement(s) presented to lessee-dealers in March, 2000 to which Plaintiffs *did* consistently point as indicative of Equilon's alleged lack of good faith in the formulation and development thereof was the purportedly increasing rent which RO-ROs were asked to pay under the Rent provision of the new agreement(s) and the elimination of the Variable Rent Program ("VRP") which had previously been offered to dealers in the Shell network.

103. Prior to the formation of Equilon and/or Motiva, Shell and Texaco employed different lessee-dealer rental structures which later converged into a uniform structure under the new agreement(s). *See* Goll testimony; Hanley testimony; Shelton testimony. Texaco determined rent for each dealer based on a percentage of the FMV of the land and existing fixtures, plus additional costs for taxes and maintenance. *See* Goll testimony; Styslinger testimony; Shelton testimony. Rent paid by Shell lessee-dealers, by contrast, was determined by first adding to-

---

**21.** This also exemplifies the "severability" of these provisions.

**22.** These dealers signed *even though* an interest group of dealers sent out an "urgent" letter to dealers urging them *not* to sign pending the outcome of this civil suit. *See* Exhibit 1196; Dagher testimony.

gether the rent value specified in the lease agreement plus any add-ons (i.e., Electronic Point of Sale ("EPOS") fees), and then (until August, 1998) deducting from that total any Variable Rent Program ("VRP") rebate earned based on the lessee-dealer's gasoline sales volume. *See* Goll testimony; Hanley testimony; Styslinger testimony. As such, Shell's contract rent figures were not based upon a fair market value (FMV) calculation, as were Texaco's.

104. The VRP was instituted in 1982, in response to market trends favoring high volume gasoline sales. *See* Hanley testimony.

105. To encourage dealers to sell higher volumes of gasoline, Shell offered the VRP, a rent rebate that decreased rent in proportion to monthly gasoline sales. *See* Hanley testimony. It is undisputed that the VRP always remained subject to cancellation by Shell, on thirty (30) days' notice, but it apparently remained in place relatively consistently from 1982 until cancellation in August, 1998. *See* Exhibit 1133.

106. It was already apparent to Shell, prior to the formation of the alliance, that the value of the VRP as a marketing ploy had diminished quite significantly. *See* Hanley testimony. Specifically, the VRP system encouraged high volume gasoline sales, but the petroleum industry was no longer sustained by high volume sales. *See* Hanley testimony. As a result, in December, 1997, Shell began to develop ROM2000, a revenue-sharing rent model that was to replace VRP by April, 1998. *See* Exhibit 1059; Hanley testimony. However, ROM2000 faced staunch opposition from dealers, and was never implemented. In the interim, elimination of the VRP was delayed. *See id.*

107. Elimination of the VRP was further delayed by the formation of the alliance in early 1998 (Equilon was actually formed in April, 1998, though its formation was retroactive to a January 1, 1998 formation date). After determining it would be inefficient to eliminate the VRP and to replace it with ROM2000 given the upcoming transfer into the alliance, Shell "put it on ice." *See* Hanley testimony. As a result, though Shell announced the end of VRP in April, 1998, the VRP rent program did not formally come to an end until on or about August 1, 1998. *See* Goll testimony; Hanley testimony.

108. Among the reasons that Shell, and then Equilon and Motiva, sought to eradicate the VRP, was that it inappropriately "bundled" rent with pricing and volume. *See* Exhibit 13. Management became concerned that VRP misaligned incentives for dealers, because it focused so heavily on volume sales, which were no longer the key to profitability in the "new" petroleum marketing industry. *See* Hanley testimony. In particular, VRP encouraged dealers to price lower and lower so as to increase volume and thereby decrease their rents, reducing their gasoline margins to the breaking point. *See* Hanley testimony. Hanley testified that the VRP had "lost its edge" as an incentive program, and had (as is perhaps evidenced by this lawsuit) become an "entitlement" in the eyes of dealers. *See* Hanley testimony; *see also* Exhibit 13. However, he said that neither he nor any other employee ever promised that the VRP would continue in perpetuity. It was always subject to cancellation. *See* Hanley testimony.

109. Equilon also had concerns that the VRP created potential for a violation of the Robinson–Patman Act (a federal law, with state-law equivalents, governing discriminatory pricing). *See* 15 U.S.C. § 13(b); Exhibit 13. Lastly, Equilon was also concerned that the VRP encouraged fiscal inequities between dealers: the dealers with the nicest stations, with the most improvements (e.g., car washes, C-stores,

etc.), or in the best locations, which could draw the largest numbers of customers, might ironically end up paying less rent than dealers with less desirable locations or physical plants, as a result of their volume sales. *See* Hanley testimony.

110. Accordingly, Equilon canceled the VRP as of August 1, 1998. *See* Goll testimony; Hanley testimony. At this time, lessee-dealers became responsible for paying the full "contract rent" contained in their pre-Equilon lease agreements (which had been just recently assigned to Equilon). This "contract rent" was often triple or quadruple what the Shell dealers had paid under the VRP. *See* Hanley testimony. It was not a figure based on the fair market value (FMV) of their leased premises (and its improvements/equipment); exactly how this "contract rent" figure had been chosen by Shell was never clearly specified at trial. *See, e.g.,* Hanley testimony.[23]

111. After the alliance was formed, measures were undertaken to unify the Shell and Texaco (and Star) rental systems. An alliance-wide decision was made to employ a lessee-dealer rental structure similar or identical to that which was the norm for Texaco dealers, based on the FMV of the premises. *See* Little testimony; Hanley testimony. The first step in this transition was the implementation of the Interim Rent Challenge policy for lessee-dealers (presumably the bulk of those taking advantage thereof would be Shell dealers) in March, 1999. *See* Goll testimony; Hanley testimony. This enabled dealers to transition to rent based on FMV.

112. In instituting the Interim Rent Challenge policy, Equilon may also have recognized that somewhat artificial rents were being charged under the existing contracts, inasmuch as the "contract rents" were not calculated from the FMV of Shell stations. Shell dealers, most likely, suddenly went from paying far less than similarly-situated Texaco dealers (due to the VRP) to paying as much or more than equivalent Texaco dealers. Therefore, Equilon offered (Shell) dealers the option of challenging their "contract rents"/replacing these figures with an amount based on the FMV of their stations.

113. Under the Interim Rent Challenge policy, lessee-dealers had the option of having an appraisal (at the dealer's expense) done of their premises, improvements, and equipment. They would then have their "Interim" rent calculated based on the appraised value(s) (presumably in the same formula as that later adopted for the new agreement(s)–10% of the land value plus 12% of the value of equipments and improvement, divided by 12 to get a monthly value-the "10/12/12 formula"). If the "Interim" value was lower, the lessee-dealer would get the benefit of this lower rent. If it were higher, however, the lessee-dealer only paid "contract rent." *See* Radici testimony. It is unclear how many Plaintiffs took advantage of this policy (which may not have been heavily advertised), but at least Plaintiff Maksimous had his rent go down after he challenged his "contract rent." *See* Maksimous testimony.

114. With the possible exception of this "contract rent" period, Shell dealers had

---

**23.** Hanley did refer to incremental increases in "contract rent," that averaged between 2.5% and 10% per year, until the amount reached a level referred to as the "indifference rent." This "maximum" value was apparently that amount of rent that Shell would have been willing to accept as a reasonable return on the value of the property *without* the sale of any gasoline thereon. *See* Hanley testimony. Therefore, it appears that the "contract rent" figure was somewhat artificial, as it was always intended to be reduced to account for revenue gained via gasoline sales or other revenue streams. *See* Shelton testimony.

typically paid much lower rents under the VRP than had Texaco dealers. *See* Hanley testimony.

115. The FMV rental scheme (with the 10/12/12 formula) was also built into the new uniform agreement(s) (Rent provision). The property and improvements value from which FMV rent was calculated was to be determined by appraisal. Thus, the alliance companies envisioned that as part of the roll-out of the new agreement(s), all of the stations which had not yet been assigned a value (presumably all or most of which were Shell dealers) would first be professionally appraised so that a value could be assigned to the Rent provision(s).

116. Also built into the new agreement(s) was a right/ability of lessee-dealers to *challenge* the appraisal value (and thus the Rent calculated therefrom) assessed for their stations, by requesting a re-appraisal (at the lessee-dealer's cost) to be performed by an appraiser randomly selected from a list of M.A.I.-certified [24] property appraisers maintained by Equilon. The "Re–Appraisal Request Notice Form" appears as an attachment to/part of the RFL, with the new agreement(s), and provides the method for a lessee-dealer to request that his or her station be re-valued. *See* RFL (Exhibit 129).[25] The lessee-dealer who opts for a re-appraisal must live with the result, as the Notice

stipulates that once re-appraisal is requested, the original valuation is withdrawn and will be replaced by the re-appraisal value (higher or lower).

117. In preparation for the roll-out of the new agreement(s), in early 1999 Equilon began ordering appraisals of all of the as-yet-unappraised dealer stations in its network. In the PSR (and indeed throughout California), this appraisal work was done almost exclusively by Hopkins Appraisal Services, Inc., a Missouri-based firm which specializes in appraisals of gasoline retail marketing outlets, and which has done appraisals for all of the major oil companies nationwide. *See* Rouse testimony; *see also* Styslinger testimony. Though Equilon was familiar with Hopkins from prior experience, it did not employ a formal bid procedure to choose an appraisal firm. Hanley testified that this was sloppy, due to the time constraints of needing to get the new agreement(s) finalized and out to dealers. *See* Hanley testimony.

118. Indeed, although Equilon insists on M.A.I. certification for the appraisers which are included on its accepted list for purposes of rent challenge re-appraisal requests, it did not insist on this qualification for these initial appraisals, as Rouse, who performed a large number of the appraisals of Plaintiffs' stations, is not M.A.I.-certified.[26] It is not clear that anyone working for Hopkins has this designation.

---

**24.** M.A.I. designates one as a Member of the Appraisal Institute, a private national organization which offers a certification which is additional to any state certification which an appraiser might have.

**25.** The "Re–Appraisal Request Notice Form" states that it must be received within 30 days of the date of transmittal of the letter that accompanies the new agreement(s). It also stipulates that the lessee will pay the cost of re-appraisal, which could be $2,500.00 or more.

**26.** Nor is he permanently certified by the State of California; he testified that he is certified in Kansas and in Iowa, and that he is in the habit of simply seeking temporary certification from the State of California whenever he needs to perform an appraisal in California. He testified that certification by every state in which an appraisal might be performed is not necessary, and not economical, and that the Hopkins firm has appraisers with various certifications, so that they can mix and match them with the workload. Rouse's explanation for not having the additional M.A.I. certification was similar: the benefits

119. However, Williams, the M.A.I.-certified appraiser called by Plaintiffs, agreed with Rouse that there is no "magic" to the M.A.I. certification, and that many perfectly competent appraisers are not M.A.I.-certified. *See* Rouse testimony; Williams testimony.[27] Indeed, Williams also specifically stated that she is familiar with both the Hopkins Appraisal Services in general, and Rouse in particular, and has no doubts about their competence. She stated that she shares "comparables" (sales data on "comparable" recent sales that is used to assess probable sales price for an appraisal) with Rouse, and has a good overall opinion of his work. *See* Williams testimony. Rouse and Williams testified that they follow the same basic ("USPAP") appraisal methodology. *See* Rouse testimony; Williams testimony. They also both stated that appraisal is more of an art than a science, and that different appraisers will almost always come up with some difference in value, even assuming they use the same basic information. *See* Rouse testimony; Williams testimony.

120. As has been stated, Rouse did most or all of the appraisals on Plaintiffs' stations and/or other lessee-dealer outlets within the PSR, beginning in about January of 1999. *See* Rouse testimony. These appraisals were transmitted to the team that was then working on the new agree-

ment(s), so that the values derived therefrom could be integrated into the Rent provision(s) therein. *See* Styslinger testimony.

121. Plaintiffs have complained that the appraisal values that Rouse/Hopkins gave their stations were too high, resulting in rents under the new agreement(s) that are not reflective of the real value of their stations. Plaintiffs had all or nearly all of their stations re-appraised by Williams, at some point between their initial appraisal by Hopkins and this litigation.[28] It is undisputed that all or nearly all of the appraisal values for the leased premises and all the equipment and improvements thereon assigned by Williams were lower than those assigned by Rouse/Hopkins, sometimes quite significantly so. *See* Rents and Appraisals Stipulation; *see also* Exhibit 758. For instance, the station appraisal and re-appraisal on which Plaintiffs focused their most effort was for the station at 20223 S. Avalon Boulevard in Carson, California (Del Amo Shell, leased/run by Plaintiff Merhi): Hopkins/Rouse assessed this station as having a land value of $984,000.00, an improvements value of $227,000.00 (after depreciation), and an equipment value of $265,000.00 (after depreciation). By contrast, Williams assessed values of $575,000.00, $95,000.00, and $155,000.00, respectively.[29]

---

of having it did not justify the cost(s). *See* Rouse testimony.

**27.** Williams also agreed that there are or may be M.A.I.-certified appraisers who are *not* competent. She testified to having reported to the Appraisal Institute a complaint about an M.A.I-certified appraiser whom she considered incompetent. *See* Williams testimony.

**28.** It was never made clear whether these re-appraisals were done in the context of some sort of formal "rent challenge" instituted by these Plaintiffs (who would not have had access to the Re–Appraisal process instituted

under the new agreement(s), not yet having signed them), or were prepared solely for purposes of this litigation. Nor was it made clear *when* all of these re-appraisals were done. The one to which Williams, and Plaintiffs, referred most often (Exhibit 133) was completed on July 3, 2000. *See* Williams testimony; Exhibit 133.

**29.** This was by far the largest difference in appraisal value for any of the Plaintiffs' stations, and many of the other re-appraisals, although lower, were not nearly as much of a downward departure.

122. There is therefore no dispute that Plaintiffs' Rent would be lower (sometimes significantly so) using the appraisals that were prepared by Williams than those by Hopkins/Rouse.[30] On its own, however, this is no cause for suspicion, inasmuch as even Williams agreed that appraisal values can vary quite significantly between different appraisers, and based on her credible description of her own competence as well as that of Hopkins/Rouse (this also eliminates any inference from the lack of M.A.I. certification). *See* Williams testimony.

123. There is also no dispute that at least some Plaintiffs (and other Shell lessee-dealers) will experience an increase in their total rental payments under the new agreement(s), and under the new FMV rent system, over their prior "contract rent," and especially over the amount paid under the VRP.

124. Recognizing that some dealers (particularly Shell-branded dealers) would be paying substantially more rent under the new FMV rent system, Equilon and Motiva designed a program under which the transition from "contract rent" to the new "program rent" (under Equilon's FMV system) would take place over four to five years (from 1999 to the end of 2003). *See* Hanley testimony; Hallberg testimony; Exhibits 17, 18.

125. Those dealers new to the FMV rent system would be gradually "migrated" from what they had previously paid to paying 100% of "program rent." There were three transition Options, and each region (e.g., the PSR) would choose (presumably the highest) among the three: (1) Option 1–50% of contract rent (the Shell or Texaco rent without the VRP) in 1999, 63% of contract rent in 2000, 75% of contract rent in 2001, 88% of contract rent in 2002, and 100% of contract rent in 2003; (2) Option 2–50% of program rent (as calculated for the new Equilon agreement(s)) in 1999, 63% of program rent in 2000, 75% of program rent in 2001, 88% of program

---

30. Plaintiffs also noted the existence of a slightly suspicious paper trail with regard to Rouse's high-value appraisal of the Del Amo Shell station at 20223 S. Avalon Boulevard. It appears, based on the exhibits presented to him by Plaintiffs' counsel, and his testimony, that the figures cited above were Rouse's initial calculations of the value of the Del Amo Shell station. *See* Exhibit 1; Rouse testimony. For this initial appraisal, as was apparently true for all appraisals when they were first prepared, Rouse did not prepare a full "report," but merely transmitted the above-quoted appraisal values to Equilon (in or around January of 1999). After this suit was filed, however, in May of 2000, Rouse was asked by Equilon/Styslinger to prepare what can more formally be called an appraisal "report," containing all of his assumptions, the comparable sales data, and other information on which Rouse relied in formulating his opinion. Rouse prepared a full "report," dated July 26, 2000. However, he *updated* his appraisal for the passage of time since January, 1999, revising the values downward somewhat to $826,000.00, $166,000.00, and $237,000.00, respectively. *See* Exhibit 134.

When Styslinger received this report, she apparently called Rouse to clarify that what she actually had wanted was a report that was effective *as of* September 1, 1999 (the date to which it had been agreed that all of the station appraisals should be normalized), not July 26, 2000. *See* Rouse testimony. Therefore, he prepared a new formal report, with a "report date" of August 14, 2000, but "effective date" of valuation of September 1, 1999. In this report, Rouse again revised his appraisal values: this time he reverted back to the values he had given initially in January, 1999: $984,000.00, $227,000.00, and $265,000.00. It is a bit odd that, in Rouse's three appraisals, the value of the station would not change from January to September, 1999, but diminished not insubstantially from September, 1999 to July, 2000. However, this was only one appraisal, at one station, and Rouse quite clearly testified that nobody at Equilon ever asked him to inflate an appraisal value, or otherwise affect rents. *See* Rouse testimony. In any case, any lessee-dealer unhappy with an appraisal value and/or the resulting Rent provision would be able to seek a re-appraisal thereof.

rent in 2002, and 100% of program rent in 2003; or (3) Option 3–the prior six months' average net retailer rent. To these values were added Tax and Maintenance costs, to arrive at "Total Rent."

126. Whichever transition Option was chosen applied uniformly in each region (e.g., the PSR). *See, e.g.,* Hanley testimony.

127. Plaintiffs' total Monthly Lease Payments under the new agreement(s) also include the pass-through of "double net expenses" made up of taxes and maintenance costs (i.e., the Tax and Maintenance provisions). Plaintiffs complain about the policy of explicitly charging maintenance fees and taxes to dealers, which had never previously been the policy under Shell, and of charging maintenance fees based on the average costs for a particular *region*, rather than seeking to pass through the costs incurred by a particular dealer.[31]

128. Plaintiffs offered testimony suggesting that while Shell is not the only major oil company to charge its lessee-dealers for maintenance, it may be alone, or among a very few, in charging an *average* maintenance fee to all lessee-dealers regardless of size or actual costs. *See* Shelton testimony; Williams testimony. Plaintiffs claim this is economically unreasonable, thereby indicating Defendant's "bad faith."

129. However, even if this Court were empowered to judge whether this policy is "economically reasonable" (which it is not), Defendant provided sufficient justification for charging an average maintenance rent to show that it had a legitimate business purpose for charging an average maintenance fee.

130. As Umbeck testified, charging a maintenance fee averaged for an entire region helps to "share the risk" across all the stations in the region, such that a lessee-dealer with a particularly heavy need for maintenance in one year or in one month is not driven out of business by the sheer weight of having to pay these costs. Moreover, it helps encourage dealers to invest in improving their stations, as they need not worry about having to bear the entire cost of increased maintenance required thereby. *See* Umbeck testimony.

131. Umbeck and others also testified that it is standard in the industry to pass through the costs of taxes and assessments. *See* Umbeck testimony; Williams testimony; Shelton testimony. The Court is also not empowered under the PMPA to question the business judgment of Defendant in deciding to do so.

132. There was absolutely no evidence presented that the decision to include the Tax and Maintenance provisions was arrived at in "bad faith," or not in the "normal course of business." Nor was there any evidence that these provisions are or were designed to prevent renewals or to convert lessee stations. This is the only subject of the Court's inquiry.[32]

---

**31.** Several witnesses testified that the prior "contract rent" for Shell dealers had *included* the cost(s) of property taxes and similar land-based charges and assessments. *See* Hanley testimony; Styslinger testimony; Goll testimony; Shelton testimony. So, although taxes had never been separately enumerated as a "line item" in Shell leases, it was not explicitly a "new" policy to pass-through these charges. In the same vein, it appears that Shell may have previously charged some individual dealers the costs of maintenance at their individual sites, but that the policy of charging an *average* maintenance fee, and to all dealers regardless of size or costs, is a new one for Shell dealers. *See, e.g.,* Shelton testimony; Uellner testimony; Williams testimony.

**32.** Therefore, although this Court might question the wisdom, and the incentives, of basing maintenance fees on a regional average, it is enough that this policy simply serve a legitimate business purpose.

133. As for the increase in the Rent itself, and/or the overall increase in the Monthly Lease Payments based on the sum of the Rent and the Tax and Maintenance fees (the "double net expenses"), this also does not indicate lack of good faith on Defendant's part, for a number of reasons.

134. First of all, while *some* of the Plaintiffs would experience an increase in their total monthly payments under the new agreement(s) over the amount(s) they were obligated to pay under the "contract rent" charged under their prior Shell agreements (which was already a substantial increase over the amount they had paid when the VRP was still in action), it is not universally true that all of the Plaintiffs (or all of the lessee-dealers in general) would pay more per month under the new agreement(s) than under the old.

135. For instance, Hallberg testified, and presented an exhibit illustrating his calculations, that a significant number of the Plaintiffs would actually experience a *decrease* in their total monthly rent payment under the new agreement(s). His figures take into account a three-year "migration" process (apparently assuming that Plaintiffs would not sign their new agreement(s) until at least 2001, so that they get the benefit of only three years of "migration" under the Option plan). Based on his comparison of the total monthly rents being paid by Plaintiffs under their existing contracts, and that which would be charged as total Monthly Lease Payments under the new agreement(s) (including Tax and Maintenance costs), Hallberg credibly concluded that 63% (17 of 27, with one Plaintiff's information not available) of the Plaintiffs would actually pay *less* per month under the new agree-

ment(s) in the first year of "migration" than they did under their previous contracts. Even in the third (and final) year of "migration," Hallberg concluded that 59% (16 of 27) would still be paying less. *See* Hallberg testimony; Exhibit 1052.

136. Somewhat conflicting numbers are presented via the parties' Rents and Appraisals Stipulation.[33] However, even in this document, for those Plaintiffs for whom it is possible to make a comparison (a total of 23 with sufficient data), at least 43% of the Plaintiffs (10 of 23) would experience a decrease in total monthly payments in their first year under the new agreement(s), and 39% (9 of 23) would still pay less in year three of the "migration" to the new agreement(s). *See* Rents and Appraisals Stipulation.

137. Hallberg also testified that by the time of trial, a total of 292 new agreement(s) had been delivered to Shell dealers in his region (the PSR), and he had taken a survey of 231 of those sites, making rent comparisons between the old and the new contracts. He found that roughly 40% of these dealers had a rent increase under the new agreement(s), while 60% experienced a rent decrease. *See* Hallberg testimony.

138. These figures are consistent with state-wide and nationwide averages in Exhibit 1167. As Styslinger testified, in year one of the migration, approximately 32% of the retailers in California (497 stations total) experienced a rent increase, while 68% actually had their rent go down. Across the U.S. (1,884 stations), 35% of dealers had a rent increase in year one under the new papers, while 65% experienced a year one rent decrease. *See* Styslinger testimony; Exhibit 1167.

**33.** This Stipulation contains different figures from those in the exhibit (Exhibit 1052) prepared by Hallberg. These differences were never adequately explained. Therefore, the Court is unable to gauge which figures are more correct, but must assume that the Stipulation is a more accurate calculation of the figures, as it is more recent.

139. Therefore, the difference between Plaintiffs' contract rent and program rent due under the new agreement(s) is not so stark as Plaintiffs claim.[34] It appears that at least about forty percent of them would actually pay *less* thereunder.

140. Second, even if *all* of the Plaintiffs would experience an increase in their total rent under the new agreement(s), it is not this Court's task to scrutinize Defendant's business decisions or substitute its own judgment (or that of the Plaintiffs) for that exercised by Equilon or Motiva. The rents being charged under the new agreement(s) are relevant *only* to the extent that they reflect Defendant's subjective intent in the preparation of the new agreement(s). There was absolutely no evidence presented that would suggest a lack of good faith or normal decision-making in migrating the Shell lessee-dealers to a FMV rental system. Quite to the contrary, Equilon/Motiva was clearly motivated by its desire to have a single rent derivation system throughout its dealer network, and to treat Shell dealers under the same terms as had previously been applied to Texaco dealers. The fact that Plaintiffs' rents may have increased somewhat does not indicate that Defendant lacked good faith in its decision to create uniformity in its lessee-dealer rents.

141. Third, every witness with an opportunity to do so stated in his or her testimony that the 10/12/12 formula being used in the new agreement(s) to determine the rental value of the Plaintiffs' (and other lessee-dealers') retail stations is absolutely standard in the petroleum industry. *See, e.g.,* Williams testimony; Shelton testimony; Umbeck testimony; Hallberg testimony; Hanley testimony; Goll testimony. The fact that Shell dealers may have previously had a somewhat more generous arrangement with regard to the rents charged for leasing their station premises (the VRP) does not mean that Defendant's decision to switch to the industry standard was not in good faith and in the normal course of business. Plaintiffs presented no evidence of a prohibited motive.

142. Fourth, Defendant's good faith in this process is further indicated by its decision to "migrate" Shell dealers to the new FMV rents system gradually, over a period of years. It was not required to do so, and could easily have insisted that Shell dealers come up to the rent levels charged to Texaco dealers immediately. However, Defendant voluntarily undertook to soften the blow for any dealer who might find the new rent difficult to meet as an initial matter. This "migration" did not work in the opposite direction. In other words, if a dealer would have his or her rent go *down* under the new agreement(s), that decrease would take effect *immediately*. It was only if the new agreement(s) *increased* a dealer's rent that "migration" was employed. *See* Hallberg testimony. Thus, dealers were entitled to reap any benefit under "migration," but could not be penalized thereunder.

143. Fifth, several employee witnesses testified that Equilon's decision to migrate Shell lessee-dealers to a FMV rental system was motivated by a desire to have a uniform rental program for both Shell and Texaco dealers. *See, e.g.,* Goll testimony;

---

**34.** The Court acknowledges that in the past, due to the VRP, all but one of the Plaintiffs (the exception being the sole Texaco-branded Plaintiff), had not paid full "contract rent" under their pre-existing agreements, and when the VRP is taken into account substantially more, perhaps all, of the Plaintiffs will be paying more under the new lease agreement(s). However, the VRP was not an "entitlement." It remained subject to cancellation on 30 days' notice. Nor may its cancellation constitute a "term" of the new agreement(s). Accordingly, Plaintiffs' rents under the VRP are essentially irrelevant to these comparisons.

Hanley testimony. Moreover, Little, who worked for Texaco prior to the formation of the alliance, stated that in his opinion it appeared that the rents charged under the new agreement(s) are about the same as the rents that had been charged under the prior Texaco agreements. *See* Little testimony. Plaintiffs did not rebut this estimate.

144. Sixth and finally, Plaintiffs point to the lack of a formal bid procedure before Hopkins Appraisal Services was chosen to perform the appraisals upon which the rental amounts in the new agreement(s) would be based as allegedly indicative of Defendant's lack of good faith. The Court cannot agree. Although Hanley testified that Defendant was a bit rushed during the period that Hopkins was chosen, and that it was perhaps sloppy not to also entertain bids from a number of appraisers, there is no indication that Hopkins is not a fully competent and capable appraisal company. It has a national reputation for retail petroleum station appraisal, and worked previously with Equilon. *See* Hanley testimony. Moreover, even Williams (the appraiser called by Plaintiffs) testified to Hopkins' competence. *See* Williams testimony.

145. For all of these reasons, the Court finds that Defendant's decision(s) to "migrate" to FMV rents, and pass through tax and maintenance costs (as separate line items) were based on a good faith desire to employ a uniform rental structure.

**Plaintiffs' Complaints About Post–Alliance Treatment by Equilon**

146. Seventeen Plaintiffs testified during the court trial. The content of their testimony obviously varied. The bulk of their time on the stand, however, was devoted to a variety of grievances about their treatment at the hands of Equilon and/or its employees. Their primary complaints covered the allegedly high rent, maintenance fees, and taxes that are or would be charged by Defendant, the termination of various programs that had previously been offered by Shell, their difficulties in communicating with Equilon employees, and their inability to compete with CORO/SORO stations, or at all, under the (proposed) terms of the new agreement(s).

147. Many Plaintiffs testified that rents and fees have risen dramatically since Equilon took over. *See, e.g.,* Maksimous testimony; Sislian testimony; Abel testimony; Buczkowski testimony; Kashaniroth testimony; Uellner testimony; Mantri testimony; Rabadi testimony; Ayoub testimony; Marquez testimony; Delgado testimony. Particularly as a result of the termination of programs previously available under Shell (e.g., the VRP), these Plaintiff witnesses complained that their costs have increased so dramatically that they are presently unable to profitably sustain their retail sites.

148. For instance, Uellner testified that Shell had previously offered an image-enhancement program that paid $500.00 a month to dealers who performed all above-ground maintenance at their stations. Now, she lamented, not only has Equilon terminated this program, but it has begun to charge dealers an average maintenance fee. *See* Uellner testimony.

149. Uellner testified that although she is now obligated to pay significant new maintenance fees that were not charged to her by Shell, she is still performing all the maintenance on her own station, just as before. *See* Uellner testimony.

150. Rabadi testified that the increase in costs had driven him to sell two of his stations back to Equilon, and to "give the keys back" for a third site. *See* Rabadi testimony.

151. Several Plaintiffs also testified that they had experienced numerous miscommunications with and/or ill-treatment

from Equilon (or affiliate) employees. Several witnesses said that Equilon had withheld information regarding the Rent Challenge process, and only disclosed the information after many complaints. *See, e.g.,* Maksimous testimony; Mantri testimony. Others testified that Equilon employees had on occasion treated them rudely in their business dealings, even going so far as to say that if the dealers were not happy with Equilon, they should "give their keys back" (an apparent term of art in the petroleum marketing industry referring to station abandonment). *See* Sislian testimony; Uellner testimony; Merhi testimony; Wilson testimony.

152. In addition, several Plaintiffs testified that Equilon had employed tactics that created hardships for them in their management of their lessee station. Some complained that accounting mistakes were made that often took many months to fix. *See* Maksimous testimony; Marquez testimony; Delgado testimony. Uellner testified that Equilon would not honor any formal or informal arrangements that she had previously established with Shell. *See* Uellner testimony.

153. Kashaniroth, the sole Texaco dealer in this litigation, also testified that Equilon opened a Shell CORO station across the street from his site, creating competition which makes turning a profit more difficult. *See* Kashaniroth testimony.

154. In response, Defendant introduced testimony from Equilon representatives Runnels and Radici, largely for purposes of rebutting Plaintiffs' claims of miscommunications, deceit, and/or rudeness by Equilon employees (though the employee about whom Plaintiffs most complained, a John Cirone, was not called to testify). These two employee witnesses, both Sales Managers in the PSR (positions with significant direct contact with lessee-dealers), spoke to their rela-tionships with several of the Plaintiff-witnesses, including Wilson, Ayoub, Uellner, Maksimous, Delgado, Marquez, Mantri, and Kaplan. *See* Runnels testimony; Radici testimony.

155. While the Court is sympathetic to Plaintiffs' complaints, and believes them to be sincere in the testimony offered during the course of the trial (Plaintiff Uellner was the most credible witness of the seventeen), it is clear that there are two sides to every specific dispute or alleged instance of rudeness identified by Plaintiffs. Runnels or Radici (or Burrow) offered alternate explanations for many problems, miscommunications, and difficulties alleged by Plaintiffs, and denied some of the more distasteful comments attributed to Equilon employees. *See* Runnels testimony; Radici testimony; Burrow testimony. Their responses to the allegations of Equilon misconduct made by Plaintiffs Wilson, Mantri, and Kaplan were particularly credible/reasonable.

156. Nonetheless, the Court has no doubt that on occasion one or more employees of Equilon or its affiliates may have lost his/her temper in various meetings with individual dealers or dealer groups (e.g., Burrow essentially admitted saying something like the "give your keys back" comment during a heated meeting with a group of dealers). The Court also finds it likely that *both* Plaintiffs and their respective Equilon representatives might have been guilty of rudeness in their interactions with one another. And Defendant has admitted making accounting mistakes (particularly regarding property taxes charged) with regard to several dealers. It is not clear what use Plaintiffs hoped to make of all this evidence, however, as the evidence presented at trial did not suggest any sort of conspiracy to drive lessee-dealers out of business, bad faith on Equilon's part, or anything more than the jock-

eying, accommodation (or lack thereof), and discontent that is likely to infect many franchisor and franchisee relationships. While Equilon employees may not have been the picture of comity and reason that they held themselves out to be, nor are Plaintiffs quite the victims of maltreatment that they projected on the stand.

157. At least two Plaintiffs admitted on cross-examination that their rents had or would actually go *down* under Equilon/the new agreement(s). *See, e.g.,* Wilson testimony; Buczkowski testimony. Maksimous also conceded that Equilon reduced his rent not insubstantially (via an interim rent challenge) after he joined this lawsuit. *See* Maksimous testimony.

158. Further, even assuming that all of the Plaintiff-witnesses were entirely correct in their testimony regarding these incidents (and that none of Defendant's explanations had any merit), the PMPA does not empower this Court to investigate petroleum franchisor business practices *in general,* except as those practices lead to the conclusion that a *termination* or *non-renewal* was effected for a prohibited purpose. Thus, even assuming that Plaintiffs are correct that they cannot survive under the policies established by Equilon, this can have no impact on the Court's decision *except as it reveals an explicit purpose to fabricate a pretext for non-renewal or for conversion to company operations.* The Court may not review Equilon's business *judgment,* absent this purpose.

159. The Court finds no such explicit purpose in this case. If anything, it appears that Defendant has made efforts to accommodate Plaintiffs' requests, has tried to make the transition from Shell to Equilon a gradual one, and has engaged in ongoing discussion with its dealers about the franchise relationship (as is evidenced by the Amendment(s) issued in June of 2001). *See, e.g.,* Exhibit 1060.

160. Moreover, by definition none of the financial difficulties allegedly suffered by the Plaintiffs can be a result of the new agreement(s), as by virtue of the entry of the Court's (Amended) Preliminary Injunction, none of the Plaintiffs has signed the new agreement(s), and therefore none of them is operating under the terms thereof. For all these reasons, Plaintiffs' testimony as to their alleged maltreatment by Equilon does not raise an inference of bad faith thereof.

**Summary of the Court's Factual Findings: No Evidence of Bad Faith**

161. In essence, it seems clear that Plaintiffs (all but one of whom are Shell-branded dealers) are complaining that they did not get a "better deal" under the new agreement(s) as proposed by Defendant in March of 2000 (and amended in June of 2001). Plaintiffs argued that these agreement(s) were the culmination of a process, which began with the SMI/RPS, through which Defendant sought to drive its lessee-dealers out of business, the final step of which was to create a franchise relationship which is economically unreasonable due to a combination of high rents and high pricing, and under which the lessee-dealers cannot reasonably survive.

162. However, Plaintiffs produced no credible evidence that the agreement(s) were the instrumentality of a *specific* intent on Defendant's part to drive out lessee-dealers and/or to convert lessee-operated stations (ROROs) to COROs or SOROs. Instead, the evidence at trial demonstrated that the new agreement(s) were the result of a good faith deliberative process by Defendant, as part of its normal decision-making process, and that the terms therein (and their uniformity) were designed in service of legitimate business purposes.

163. What Plaintiffs really seek is to have this Court replace the terms of the

new agreement(s) with what Plaintiffs (or this Court) would consider economically reasonable terms. Even if the Court were inclined to do so, such a result is beyond the Court's authority as granted by the PMPA.

164. Any conclusion of law which is deemed a finding of fact is incorporated herein by reference.

## II. CONCLUSIONS OF LAW AND PERMANENT INJUNCTION

1. Plaintiffs' First Claim for Relief in their First Amended Complaint ("FAC") is brought under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 et seq.

2. Phase One of the trial was of this First Claim for Relief.

3. This Court has jurisdiction over this matter pursuant to the enforcement provision(s) of the PMPA, 15 U.S.C. § 2805(a).

4. Venue is proper in this Court. *See* 15 U.S.C. § 2805(a).[35]

 5. The PMPA is remedial legislation that protects franchisees from arbitrary or discriminatory termination or non-renewal of their franchises. *See Khorenian v. Union Oil Co.*, 761 F.2d 533, 535 (9th Cir.1985); *Millett v. Union Oil Company of California*, 24 F.3d 10, 13 (9th Cir.1994). However, the PMPA was also "enacted to provide 'adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences.'" *Millett*, 24 F.3d at 13. Thus, it was "designed to serve two main objectives," and to strike a balance between these two sometimes contrary goals. *See id.*

6. The PMPA accomplishes these two objectives by prohibiting the termination or non-renewal of a franchise relationship except upon proper notice under 15 U.S.C. § 2804, and except for those reasons specifically enumerated by 15 U.S.C. § 2802(b). *See, e.g.*, 15 U.S.C. §§ 2802(a), (b); *DuFresne's Auto Service, Inc. v. Shell Oil Co.*, 992 F.2d 920, 925 (9th Cir.1993); *Little Oil Co., Inc. v. Atlantic Richfield Co.*, 852 F.2d 441, 444 (9th Cir.1988); *Valentine v. Mobil Oil Corp.*, 789 F.2d 1388, 1390 (9th Cir.1986). In other words, termination or non-renewal is lawful only if based on one or more of the grounds in Section 2802 (15 U.S.C. § 2802).

7. Under the PMPA, the franchisor has (absent specific cause) an obligation to renew only the "franchise relationship," not the particular "franchise." *See Valentine*, 789 F.2d at 1391. "The PMPA plainly contemplates that franchisors will have substantial flexibility in changing the terms of a franchise upon renewal." *Valentine*, 789 F.2d at 1391.

8. Therefore, among the permissible grounds for non-renewal of a PMPA franchise relationship is "failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise . . . ," provided, that is, that

---

**35.** Pursuant to 15 U.S.C. § 2805(a), a PMPA action may be brought "in the district court of the United States in any judicial district in which the principal place of business of such franchisor is located or in which such franchisee is doing business . . ." Defendant has agreed that venue is proper as to Defendant and all of the Plaintiffs save one (Souheil Bisharat). However, aside from making an objection to venue with regard to this Plaintiff, Defendant has made no motion or other effort to sever Plaintiff Bisharat from the case. Indeed, at the final pretrial conference prior to commencement of Phase One of trial, Defendant's counsel stated that inasmuch as Plaintiff Bisharat is subject to the same agreement(s) which have been presented to the remaining Plaintiffs, and any issues decided in this case will apply across-the-board to Defendant's proposed franchise agreement(s), the objection to Bisharat's inclusion is formal rather than substantive.

(i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

15 U.S.C. § 2802(b)(3)(A).

■ 9. Thus, Section 2802(b)(3)(A) provides a franchisor with an affirmative defense justifying non-renewal of a franchise relationship, so long as it can prove that decision(s) to change franchise terms were made (i) in good faith and in the normal course of business and (ii) not for the purpose of preventing renewal of the franchise relationship. *See Svela v. Union Oil Co.,* 807 F.2d 1494, 1501 (9th Cir.1987)

10. Section 2802(b)(3)(A) (15 U.S.C. § 2802(b)(3)(A)) of the PMPA contemplates and allows for the possibility of material changes in the terms of the franchise at the time of renewal and entitles the franchisor to end the relationship if no agreement is reached. *See Valentine,* 789 F.2d at 1391.

11. The primary *limitation* on a franchisor's power to change the terms of the franchise is that it must arrive at the new terms "in good faith," "in the normal course of business," and must not insist on the new terms for the purpose(s) of converting lessee-dealer stations to company operations or preventing renewal. "The legislative history of the PMPA indicates that courts should look to the franchisor's intent rather than to the effect of [its] actions, making this a subjective test." *Svela,* 807 F.2d at 1501. Thus, "[t]hese [good faith] requirements preclude judicial second-guessing of the economic decisions of franchisors." *Id.*[36]

12. "Therefore, the fact that [a franchisor's] proposed changes might make it difficult for [a franchisee] to remain in business and earn a profit is irrelevant to a finding of good faith." *Svela,* 807 F.2d at 1501. " 'So long as the franchisor does not have a discriminatory motive or use the altered terms as a pretext to avoid renewal, the franchisor has met the burden required by the PMPA for determining good faith.' " *Id.* (quoting *Valentine,* 789 F.2d at 1392, *Baldauf v. Amoco Oil Co.,* 553 F.Supp. 408, 412 (W.D.Mich.1981)).

■ 13. Accordingly, the PMPA does not give this Court authority to review the objective reasonableness of the terms of the new franchise agreement(s), or to substitute its judgment for that of Equilon/Motiva in development or promulgation of the new agreement(s) to lessee-dealers. *See id.; see also Esso Standard Oil Co. v. Dept. of Consumer Affairs,* 793 F.2d 431, 432–33 (1st Cir.1986); *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1222–23 (7th Cir.1982). The Court may review only Defendant's *process* and *proven motive* in development of the new agreement(s), and/or insistence upon their terms. *See Unocal Corp. v. Kaabipour,* 177 F.3d 755, 767 (9th Cir. 1999) ("In the context of ... § 2802(b)(3)(A) courts have ... sought to inquire into 'good faith' without engaging in 'judicial second-guessing of "the eco-

---

**36.** Plaintiffs almost certainly would have made other choices, and were this Court empowered to do so, it might also have approached some decisions differently or have come to different conclusions than those reached by Equilon. This is not the Court's task, however. The *only* issue before the Court is whether Defendant undertook normal decision-making *processes* in arriving at the terms of the new agreement(s), and did not insist on these terms to prevent renewal or convert stations.

nomic impact of an otherwise legitimate business decision by the franchisor. So long as the franchisor does not have a discriminatory motive or use the altered terms as a pretext to avoid renewal, the franchisor has met the burden required by the PMPA for determining good faith." ' ") (citations omitted).

■ 14. Moreover, for changes in a franchise agreement to have been made "in the normal course of business," they need only have been the result of the franchisor's "normal decision-making process." *Valentine,* 789 F.2d at 1392 n. 7.

■ 15. Under the PMPA, the franchisee has the initial burden of proving the termination of the franchise or the non-renewal of the franchise relationship. The burden then shifts to the franchisor to establish as an affirmative defense that such termination or non-renewal was permitted under Section 2802 (or Section 2803 for a trial franchise). *See* 15 U.S.C. § 2805(c); *see also Reyes v. Atlantic Richfield Co.,* 12 F.3d 1464, 1469 (9th Cir.1993); *Unified Dealer Group v. Tosco Corp.,* 16 F.Supp.2d 1137, 1140 (N.D.Cal.1998).

■ 16. Plaintiffs have demonstrated that they were presented with the new Equilon agreement on a "take it or leave it" basis. The cover letter attached to the new agreement(s) when they were presented to Plaintiffs in March of 2000 demonstrates that Plaintiffs were faced with the choice of either signing the agreement or facing immediate, irrevocable, non-renewal.

■ 17. These facts satisfy Plaintiffs' burden to show non-renewal. Franchisees facing an immediate threat of non-renewal may sue under the PMPA. *See Pro Sales, Inc. v. Texaco, U.S.A.,* 792 F.2d 1394, 1399 (9th Cir.1986) ("We conclude that this congressional plan would be frustrated by requiring a franchisee to go out of business before invoking the protections of the PMPA.... Congress was concerned about threats of nonrenewal as well as nonrenewals themselves."); *Akky v. BP America,* 73 F.3d 974, 975 (9th Cir.1996).

■ 18. The burden therefore shifts to Defendant to establish that this constructive non-renewal was based on a permissible ground enumerated in Section 2802 of the PMPA. Defendant has met this burden: the evidence adduced at trial showed that the terms of the new agreement(s) to which Plaintiffs objected (and therefore upon which there was a "failure to agree") were the result of determinations made by Equilon/Motiva in good faith and in the normal course of business, and that Defendant did not insist upon these terms for the purpose(s) of converting Plaintiffs' lessee-dealer stations to company-operated outlets or otherwise preventing renewal. The Court concludes that Defendant has met its burden under these standards, having established by a preponderance of the evidence introduced at trial that the new agreement(s) arose in "good faith," "in the normal course of business," and not for the purpose of preventing renewal or converting lessee-dealer stations to company-operated retail outlets.

19. Specifically, all or nearly all of those terms in the new agreement(s) at issue in this case had previously been used in one or more of the prior agreements used by the alliance companies before their 1998 merger/competitive partnership.

20. The decision to promulgate a uniform dealer agreement to all of the retail dealers in the Equilon/Motiva network was made in good faith and in the normal course of business, as was the subsidiary decision to borrow from the prior agreements used by Shell, Texaco, or Star prior to the alliance. These decisions were not made for the purpose of conversion or to otherwise prevent the renewal of Plaintiffs' franchises.

21. Similarly, the ancillary decision as to the development of a uniform rent formula based on the appraisal value of station property, improvements and equipment was made in good faith and in the normal course of business, and was not designed to encourage conversions or to prevent franchise renewals. Defendant's decision to pass through maintenance costs and property and other taxes, and its choice of a methodology under which these charges would be calculated, is a similar exercise of a reasonable and defensible business judgment.

22. Finally, neither the evidence introduced regarding SMI/RPS, nor that regarding the drop in the number of RORO stations, nor Plaintiffs' individual complaints about maintenance or other issues which arose at their lessee-dealer stations, was specifically tied to the creation or promulgation of these new agreement(s). Even if it had been, Plaintiffs have not rebutted Defendant's evidence that these actions arose out of reasonable business judgments by the alliance companies as to the "optimal channel mix" for which they were striving. If anything, Defendant has established its *propensity* for engaging in careful study and analysis.

23. Under these standards, several courts have held that mere presentation of franchise agreements on a "take it or leave it" or "as is" basis is not enough to establish bad faith. *See, e.g., Brown v. The Magness Co., Inc.*, 617 F.Supp. 571, 575 (S.D.Tex.1985); *Palmieri v. Mobil Oil Corp.*, 529 F.Supp. 506, 507 (D.Conn.1982); *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1117 (D.Conn.1980); *see also Pearman v. Texaco, Inc.*, 480 F.Supp. 767, 772 (W.D.Mo.1979).

24. These decisions are consistent with the PMPA's purpose of allowing franchi-

sors flexibility in determining/presenting the terms of the franchise to franchisees, so long as the terms are not the result of bad faith or a discriminatory motive. Accordingly, this Court also finds that Defendant's "as is" presentation of the agreements in March of 2000 is not evidence of "bad faith" or "evil motive" on its part.[37]

25. Similarly, a mere increase in rent, even where it may seem objectively unreasonable and/or where a franchisee may not be able to pay the higher rent being charged under a new franchise agreement, is not relevant to good faith so long as a rent formula is applied in a non-discriminatory manner to all of the applicable franchisees. *See Duff v. Marathon Petroleum Co.*, 51 F.3d 741, 744–45 (7th Cir.1995); *Esso,* 793 F.2d at 432; *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 788 F.Supp. 616, 621 (D.Mass.1992); *Pearman,* 480 F.Supp. at 768; *Palmieri,* 529 F.Supp. at 512; *Bellmore v. Mobil Oil Corp.*, 524 F.Supp. 850, 853–54 (D.Conn. 1981). Plaintiffs have not even consistently demonstrated that they will suffer an increase in rent that would make it difficult for them to remain in business as franchisees; regardless, this Court is not empowered to question a business judgment made by Equilon that a uniform, fair market value (FMV) rent should be applied to all of its retail dealers, under both the Shell and Texaco brands. This was a business decision.

26. The same conclusion applies to Defendant's pass-through of maintenance fees and taxes. Where it is clear that these charges are being uniformly applied, and not for the purpose of preventing renewal and/or converting to company-operated stations, and where the decision(s) to pass these charges through to the lessee-dealer

**37.** Moreover, Equilon/Motiva made a reasonable business decision to create a single uniform agreement applicable to all of its lessee

(and open) dealers. This reinforces a conclusion of "good faith."

franchisees serve a legitimate business purpose, Defendant has met its burden. *See, e.g., Grotemeyer v. Lake Shore Petro Corp.,* 749 F.Supp. 883, 891 (N.D.Ill.1990) ("The relevant inquiry here is whether the ... proposed changes reflected a good faith effort to achieve a legitimate business purpose ...").

27. Therefore, Defendant has established its affirmative defense under Section 2802(b)(3)(A) (15 U.S.C. § 2802(b)(3)(A)).

**Separate Consideration of Terms under 15 U.S.C. § 2805(f)**

■ 28. Notwithstanding Plaintiffs' failure to rebut the evidence presented by Defendant of its good faith development of the provisions in the new agreement(s) contested in this suit, and therefore the failure to make out a case under Section 2802 (15 U.S.C. § 2802) of the PMPA, several provisions of the new agreement(s) require waiver of rights protected by state or federal law, and therefore agreement thereto cannot be required to effect renewal of Plaintiffs' franchises.

29. Section 2805(f) (15 U.S.C. § 2805(f)) prohibits a franchisor from requiring, as a condition of entering into or renewing a franchise relationship, a franchisee to release or waive any right protected under the PMPA, any other federal law, or under any valid state law. 15 U.S.C. § 2805(f)(1)(B).

30. This Court has already ruled that Equilon may not condition renewal on agreement to the Release, Statute of Limitations, and/or the Limitation of Liability provisions, and that its prior presentation of the new agreement(s) containing these provisions to its lessee-dealers on a "take it or leave it" or "as is" basis was a violation of Section 2805(f).[38] *See, e.g.,* Summary Judgment Order at 21–22; Amended Preliminary Injunction at 11–13. These provisions have been withdrawn by Defendant Equilon, but the Court's prohibition stands.

■ 31. The Trial Franchise clause in the new agreement(s) is also a violation of Section 2805(f), in that it requires signatory franchisees to waive rights guaranteed under a valid and applicable state law, specifically California Business and Professions Code § 21148. *See California Service Station and Automotive Repair Association v. Union Oil Company of California,* 232 Cal.App.3d 44, 53–56, 283 Cal. Rptr. 279 (1991). Defendant may not condition renewal of the franchise relationship on this term, which impermissibly reserves to Defendant sole discretion to determine whether an assignment of a remaining term of a franchise to a new dealer without prior experience with Equilon (or another major oil company) will become a "trial franchise" (by allowing Defendant to require mutual termination of the remaining term to garner its consent).

32. Such a term eviscerates the protection afforded to petroleum franchisees by Business and Professions Code § 21148, which requires a franchisor to justify withholding its consent to a sale, transfer, or assignment of a franchise in writing, and for certain specified reasons. This Trial Franchise clause would bypass this required showing, and also allow Defendant to withhold consent for a non-enumerated reason.

**38.** It is important to note that it was only the "take it or leave it"/"as is" presentation of the new agreement(s) which rendered these provisions violative of Section 2805(f) (15 U.S.C. § 2805(f)). There is no broad prohibition on the *voluntary* waiver of rights guaranteed under state or federal law that may otherwise be waived. *Cf. Graham Oil Co. v. ARCO Products Co.,* 43 F.3d 1247–48 (9th Cir.1995). It is when renewal is *conditioned* on such a waiver that Section 2805(f) is implicated. This factual threshold has been satisfied in this case.

33. Nor is the Court persuaded by the distinction drawn during trial by Defendant between the provision considered by the state court in *California Service Station* and the clause at issue in this case (e.g., the "may" vs. "will" distinction). The Trial Franchise clause in the new agreement(s) has the same impermissible effect: it reserves to Defendant the sole discretion to require termination of an ongoing franchise, and execution of a "trial franchise" agreement, where the statute envisions only limited grounds for such an action.

34. Indeed, the PMPA expressly states that: "The term 'trial franchise' does not include any unexpired period of any term of any franchise ... which was transferred or assigned by a franchisee ..." 15 U.S.C. § 2803(b)(2). Thus, it seems clear that Defendant is attempting to accomplish in indirect fashion exactly what was excluded from the PMPA: transform the remaining years of an existing franchise into a "trial franchise." It may not do so except under the conditions allowed by California Business and Professions Code § 21148. Thus, the Trial Franchise clause waives a right protected by state law. Conditioning franchisees' renewal on acceptance of the Trial Franchise clause would violate Section 2805(f).

35. None of the other terms in the new agreement(s) contested by Plaintiffs, however, would condition renewal on the waiver of a "right" protected by state or federal law. Thus, none of these terms, presented on a "take it or leave it" basis, would violate Section 2805(f). This Court has previously ruled that neither the ADR provision nor the Attorneys' Fees provision effects such a violation. *See* Summary Judgment Order at 23–24; Amended Preliminary Injunction at 11–13. These provisions have since been withdrawn or modified.

36. Plaintiffs have not identified any specific state or federal right which is im-plicated/waived by the Rent, Maintenance, Tax, Use and Investment, Re–Appraisal, and/or Ancillary Use provisions. Thus, Section 2805(f) does not apply to these.

█ 37. The only remaining contested provision which bears further discussion, therefore, is the Transfer Fee provision (which has also been modified by the Amendment(s) sent out in June of 2001). This provision provides that Equilon may charge a "transfer fee" consisting of the greater of $6,500.00 or a percentage of the gain realized when an existing franchisee sells or assigns its franchise interest to another party. *See* RFL Part II, Art. 18(e); RSA Part II, Art. 22(e). The question is whether this provision also waives a right that is guaranteed by California Business and Professions Code § 21148, which allows that a franchisor may require a transfer fee *only* where "the amount of the fee is reasonable when compared to the sale price of the franchise and provided the fee is not required in an effort to frustrate the proposed sale." Cal. Bus. & Prof.Code § 21148(d) (West 2001).

38. The Court concludes that the Transfer Fee provision does not require waiver of a "right" protected by Section 21148(d). Whether the $6,500.00 or more which Equilon is entitled to charge under the new agreement(s) will be unreasonable, or is being required "in an effort to frustrate" a proposed sale, is a decision that can only be made in an individual case (i.e., with regard to a particular sale). The Court cannot say that this amount will *always* be unreasonable, as the statute provides that this will depend on the overall sale price of the franchise. Similarly, prohibited intent to frustrate a transfer must be judged with regard to each particular "proposed sale," not based simply on this term.

39. Therefore, the only "right" protected by Section 21148 is the right to a

"reasonable" transfer fee, and to have that fee not be enforced for the purpose of frustrating a sale. This "right" is not hampered or waived by the inclusion of the Transfer Fee provision, as a signatory franchisee to an agreement containing this term would still have the right to ensure, under Section 21148, that the $6,500.00 or more that is charged by Equilon with regard to a particular transfer is "reasonable" given the overall sale price, and is not being charged by Equilon merely to frustrate said transfer. This would be assessed by way of a separate Section 21148 claim; this is not a proper subject for Section 2805(f).

40. Therefore, Defendant may not condition renewal of franchises on the acceptance of the Release, Statute of Limitations, Limitation of Liability, or Trial Franchise provisions. To do so would violate Section 2805(f) of the PMPA.

**41. Therefore, Defendant is PERMANENTLY ENJOINED from _requiring_ agreement to the Release, Statute of Limitations, Limitation of Liability, and Trial Franchise provisions as a condition to the renewal of any franchise held by any Plaintiff.**[39]

42. However, neither these provisions nor any of the others that have been challenged by Plaintiffs (either in the Complaint or for the first time at trial) are themselves indicative of a lack of good faith on Defendant's part in the preparation or promulgation of the new agreement(s) in which they were (initially) contained. In other words, Plaintiffs may not "bootstrap" the inclusion of these provisions prohibited by Section 2805(f) into a violation of Section 2802(b)(3).

■ 43. Moreover, the inclusion of these terms in the agreement(s) does not mean that the agreement(s) are unenforceable in their entireties. Where particular terms would violate the PMPA if renewal is conditioned upon their inclusion, the Ninth Circuit has expressly held that invalidation under Section 2805(f) does not lead to invalidation of the entire agreement so long as the term(s) are severable from the rest of the agreement. _See Graham Oil Co._, 43 F.3d at 1248–49.

44. Here, it is clear that the Release, Statute of Limitations, Limitation of Liability, and Trial Franchise provisions are severable from the remainder of the new agreement(s). The broad understanding of severability in the new agreement(s)' Severability provision is consistent with the liberal view of severance taken by California courts. _See Armendariz v. Foundation Health Psychcare Services, Inc._, 24 Cal.4th 83, 122, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000); _Keene v. Harling_, 61 Cal.2d 318, 320–321, 38 Cal.Rptr. 513, 392 P.2d 273 (1964). Thus, so long as the "basic intent" of the agreement(s) is preserved without inclusion of these provisions, they are severable from the agreement, and the remainder enforceable. _See also Graham Oil Co._, 43 F.3d at 1248. Plaintiffs have provided no argument or

---

**39.** The Court emphasizes that this finding has no bearing on the enforceability of these provisions as a general matter, where they are a subject of voluntary negotiation between contracting parties. Where a provision which waives a statutory right or privilege (and waiver is otherwise permissible) is included in a petroleum franchise agreement due to a franchisee's _voluntary_ agreement thereto, Section 2805(f) is not implicated. It is only when renewal is _conditioned_ on acceptance of such term that a contract of adhesion is formed, and this Section is violated. _See Graham Oil Co._, 43 F.3d at 1247–48; _Carter v. Exxon Company USA_, 177 F.3d 197, 202 (3d Cir. 1999); _Korangy v. Mobil Oil Corp._, 84 F.Supp.2d 660, 666–67 (D.Md.2000); _Riverdale Enterprises Inc. v. Shell Oil Co._, 41 F.Supp.2d 56, 66 (D.Mass.1999). These provisions may still be a proper subject of voluntary negotiations.

authority suggesting otherwise, nor is there any other basis for the Court to conclude that the Release, Statute of Limitations, Limitation of Liability, and Trial Franchise provisions cannot be severed. Indeed, the first three of these have already been "severed" by way of the Amendment(s) sent out to all dealers by Defendant in June of 2001. This illustrates their non-essential nature.

45. Accordingly, with the exception of those provisions which have been identified as violative of Section 2805(f) (to the extent that renewal was conditioned on their acceptance), and which have been shown to be severable from the primary purposes of the new agreement(s), Defendant is/was entitled not to renew Plaintiffs' franchise relationships based on their failures to agree to the new franchise terms. This is a "failure to agree" satisfying 15 U.S.C. § 2802(b)(3), and justifying a notice of non-renewal under 15 U.S.C. § 2804.

46. **Thus, the Court DISSOLVES its prior (Amended) Preliminary Injunction, and finds that a failure to agree to the terms in the new agreement(s) is sufficient for non-renewal of Plaintiffs' franchise relationships. Moreover, the First Claim for Relief is hereby DISMISSED, with prejudice.**

47. Plaintiffs shall be afforded an additional opportunity to make the choice with which they were presented in March of 2000: renewal upon the terms in the new agreement(s) (as amended), or permissible non-renewal pursuant to the PMPA.

48. **Accordingly, within a reasonable time after entry of this Order, Defendant is ORDERED to re-present to all Plaintiffs still eligible for renewal (i.e., whose franchises have not been otherwise terminated or surrendered) a ver-**

sion of the new agreement(s) consistent with this Order.[40] **Plaintiffs shall have thirty (30) days from the date of presentation to decide whether to accept, and to inform Defendant thereof. If, by that date, any Plaintiff has not communicated its acceptance to Defendant, Defendant may then send to that Plaintiff a notice of non-renewal complying with 15 U.S.C. § 2804, in which the cited reason for non-renewal may be the "failure to agree" to franchise terms proffered in the new agreement(s). Such notice must be provided at least ninety (90) days prior to the date that the non-renewal of the franchise is to take effect. *See* 15 U.S.C. § 2804(a)(2).**

49. Any finding of fact which is deemed a conclusion of law is incorporated herein by reference.

## III. CONCLUSION AND PERMANENT INJUNCTION

While the Court does not doubt that some or all of the Plaintiffs have experienced difficulties in their franchise relationships with Equilon, on a small or on a more significant scale, the Court does not find that Equilon's development of the new franchise agreement(s) from August 1998 until April 1999, and/or the subsequent roll-out thereof, evidences anything other that a "good faith" attempt to standardize their agreement(s). The provisions in the new agreement(s) arose from regularized decision-making, in the "normal course of business," and nothing in either the SMI/RPS, the agreement(s) themselves, and/or the creation thereof evidences a specific intent to use the new agreements to prevent renewal or as a tool for effecting conversion of lessee-dealer stations into

---

**40.** As stated, terms violative of Section 2805(f) if presented as a condition of renewal

may still properly be subjects of negotiation.

company operated retail outlets (COROs or SOROs). Accordingly, Defendant has met its burden of proof under 15 U.S.C. § 2802(b)(3)(A), and Plaintiffs' First Claim for Relief fails.

Based on the above-described findings of fact and conclusions of law, it is therefore the ORDER of this Court that:

The First Claim for Relief is hereby DISMISSED, with prejudice.

The Court hereby DISSOLVES its prior Amended Preliminary Injunction, entered by this Court on September 11, 2000.

Defendant is hereby PERMANENTLY ENJOINED from conditioning its renewal of any Plaintiff on the Release, Statute of Limitations, Limitation of Liability, or Trial Franchise provisions.

Defendant is hereby ORDERED to represent the (amended) new agreement(s) to those Plaintiffs still eligible for renewal within a reasonable time after entry of this Order. If any eligible Plaintiff does not submit its acceptance thereof to Defendant within thirty (30) days, Defendant may then send a notice of non-renewal complying with 15 U.S.C. § 2804.